# EXHIBIT 2

Loly G. Tor
**K&L GATES LLP**
One Newark Center, 10th Fl.
Newark, NJ 07102
P: (973) 848-4000
F: (973) 848-4001
loly.tor@klgates.com
Attorneys for Plaintiff World
Wrestling Entertainment, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>    Plaintiff<br><br>    vs.<br><br>JOHN AND JANE DOES 1-100,<br>And XYZ CORPORATIONS 1-100,<br><br>    Defendants. | Civil Action No. _____<br><br>**DECLARATION OF LAUREN DIENES-MIDDLEN, ESQ.** |

I, Lauren Dienes-Middlen, state that:

1.     I am Senior Vice President, Assistant General Counsel -- Intellectual Property, Business and Legal Affairs of Plaintiff World Wrestling Entertainment, Inc. ("WWE").  I am authorized to make this declaration, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(d), in support of WWE's Ex Parte Motion for Temporary Restraining Order, Order of Seizure and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

2.    I certify that I have personal first-hand knowledge about the matters discussed below unless otherwise indicated and am competent to testify about them if called upon to do so.

3.    I have worked at WWE for the last 18 years in connection with, among other things, the acquisition, maintenance, licensing and enforcement of WWE's intellectual property.  I also have been involved with WWE's application for and enforcement of temporary restraining orders, seizure orders and preliminary injunctions to stop counterfeiters from selling counterfeit WWE merchandise at WWE live events, where WWE sells a large variety and volume of genuine WWE merchandise.

4.    WWE licenses the right to print, manufacture, distribute, offer for sale and sell merchandise bearing WWE's protected trademarks and service marks to a limited number of entities.  As a condition of each such license, WWE requires that licensees refrain from selling licensed products in the vicinity of any WWE live event.  As a result, WWE is able to control the WWE merchandise that is sold at and in connection with WWE live events.

5.    For each WWE live event, venue merchandise coordinators meet in advance to discuss the merchandise and the market and agree on the logistics of the merchandise sales for the particular event, such as the number and location of the

booths, number and location of personnel, how many of each type of shirt or other merchandise to have on hand and other such information.

6.      On the day of each event, the venue merchandise team is present at the arena, coordinates and inspects the sales facilities and plan, and supervises and monitors the overall sales operation for WWE.  After the event, the team oversees the accounting for all sold merchandise, as well as the counting and repackaging of any unsold merchandise, and creates a detailed report summarizing this information.

7.      Because they are intimately familiar with the limited number and types of self-sourced WWE merchandise offered for sale at live WWE events, the venue merchandise coordination team easily can distinguish counterfeit merchandise from legitimate WWE product.  Moreover, because of the limited number of licensees who are authorized to print, manufacture, distribute, offer for sale, and sell WWE merchandise, the venue merchandise team also can discern counterfeit merchandise bearing inferior imitations of WWE's protected trademarks and service marks from official, licensed merchandise.  I also have created a mini-booklet that can be easily carried in one's pocket that identifies WWE's authorized merchandise by design so that official, licensed merchandise can be readily distinguished from counterfeit merchandise.  I distribute this booklet to the venue merchandise team to carry with them at all times.

8.     As a result of the increase in counterfeiting activity at WWE live events, in 2008, WWE sought and obtained an <u>Ex</u> <u>Parte</u> TRO and Seizure Order from the Middle District of Florida in connection with WWE's WrestleMania® 24 events at the Amway Arena and the Citrus Bowl in Orlando, Florida.  The court issued the Seizure Order.

9.     At the WrestleMania® 24 events in Orlando, WWE encountered numerous counterfeiters and, pursuant to the <u>Ex</u> <u>Parte</u> TRO and Seizure Order, WWE was able to obtain the identities of some of the counterfeiters (who became named defendants) and seize more than 1,000 counterfeit t-shirts.

10.    Encouraged by this success, WWE sought and obtained an <u>Ex</u> <u>Parte</u> TRO and Seizure Order from the District Court for the Southern District of Texas in 2009 in connection with WWE's WrestleMania® 25 events at the Reliant Center and Toyota Center in Houston, Texas.  Similar to the WrestleMania® 24 events, WWE encountered numerous counterfeiters at the WrestleMania® 25 events and, pursuant to the <u>Ex</u> <u>Parte</u> TRO and Seizure Order, WWE was able to obtain the identities of some of the counterfeiters (who became named defendants) and seize approximately 1,500 counterfeit t-shirts.

11.    I personally attended WWE's WrestleMania® 27 weekend events, held March 30-April 4, 2011, in Atlanta, Georgia, and WWE similarly encountered an untold number of individuals, who came from all over the United States,

distributing and selling Counterfeit Merchandise. With the aid of the <u>Ex</u> <u>Parte</u> TRO and Seizure Order issued by the United States District Court for the Northern District of Georgia, WWE was able to gain some measure of control over such counterfeiting by seizing more than 3,000 counterfeit t-shirts during the WrestleMania® 27 weekend events. The t-shirts were being sold for at least $10 per shirt.

12.    From March 29, 2012 through April 1, 2012, I attended WWE's WrestleMania® 28 Weekend Events to assist with the enforcement of an <u>Ex</u> <u>Parte</u> TRO and Seizure Order issued by the United States District Court for the Southern District of Florida and testified before the District Court regarding those and past WWE enforcement efforts. Attached hereto as Exhibit 1 is a true and correct copy of the transcript from the Preliminary Injunction hearing before the Southern District of Florida.

13.    Despite a substantial police presence at and around each of the WrestleMania® 28 Weekend Events in Miami, Florida, WWE encountered counterfeiters from California, New York, and Florida. Through enforcement of the Seizure Order, WWE seized hundreds of counterfeit T-shirts. Many of the counterfeit shirts were identical in design, even though they were sold by different vendors from different states.

14.     Attached hereto as Exhibit 2 is a PowerPoint presentation that I created after the WrestleMania® 28 Weekend Events in Miami, Florida showing the counterfeiting activities WWE encountered.  I presented Exhibit 2 to the District Court in connection with live testimony set forth in Exhibit 1.  The District Court relied upon this Exhibit and my testimony in granting WWE a nationwide preliminary injunction and seizure order.

15.     I was in East Rutherford, New Jersey, from April 4 through April 7, 2013 for WWE's WrestleMania® 29 Weekend Events to assist with the enforcement of the Ex Parte TRO and Seizure Order issued by this Court on March 27, 2013.

16.     At the WrestleMania® 29 Weekend Events, WWE encountered counterfeiters from California, New York, Pennsylvania and Connecticut. Through enforcement of the Seizure Order issued by this Court, WWE seized counterfeit T-shirts, DVDs, action figures and posterboards and obtained a permanent injunction against one of the counterfeiters.  Similar to past live events, many of the counterfeit shirts were identical in design, even though they were sold by different counterfeits from disparate locations in the United States.

17.     Attached hereto as Exhibit 3 is a PowerPoint presentation that I created after the WrestleMania® 29 Weekend Events.  The presentation illustrates the counterfeit merchandise that WWE seized during the WrestleMania® 29

Weekend Events pursuant to this Court's March 27, 2013 Order.  In addition, the first slide of the PowerPoint presentation shows counterfeit merchandise that WWE encountered in Pittsburgh, Pennsylvania and Cincinnati, Ohio more than two weeks prior to WrestleMania® and that also appeared at the WrestleMania® 29 Weekend Events.

18.    I was in New Orleans, Louisiana, from April 2 through April 7, 2014 for WWE's WrestleMania® 30 Weekend Events, which included WWE's WrestleMania® 30 event at the Mercedes Benz Superdome on April 6.  I personally observed counterfeiting activity in and around the Superdome as well as the adjacent streets.  Because the United States District Court for the Eastern District of Louisiana denied WWE's application for an Ex Parte TRO and Seizure Order, WWE was limited in the actions it could take against the counterfeiters.  I worked with local law enforcement to obtain the identities of four counterfeiters all of whom were selling the identical counterfeit merchandise.

19.    As discussed in WWE's Verified Complaint and memorandum of law in support of its Ex Parte Motion, the district court's denial of WWE's application was subsequently vacated by the Court of Appeals for the Fifth Circuit.

20.    I was in San Jose and Santa Clara, California from March 24, 2015 through March 31, 2015 for WWE's WrestleMania® 31 Weekend Events. Following the issuance of a TRO and Seizure Order from the Northern District of

California's, WWE engaged the Department of Homeland Security ("DHS") to enforce the Court's Order at WWE's WrestleMania® 31 Weekend Events.

21.     To ensure that all merchandise seized under the Northern District of California's Order was properly designated and attributed to the specific counterfeiter who was served, I instructed DHS to complete a "Venue Enforcement Report."  A "Venue Enforcement Report" is a form that WWE created and has used to collect the following information about the seizure and the individual from whom the merchandise was seized: (1) Date of the Event; (2) Event Venue; (3) Name of Defendant Served; (4) Address of Defendant Served; (5) Time Defendant Served; (6) Type of Merchandise Seized; (7) Quantity of Merchandise Seized; (8) Approximate Height of Defendant; (9) Approximate Weight of Defendant; (10) Ethnicity of Defendant; and (11) Law Enforcement Involved.

22.     For each of the Defendants served during WWE's WrestleMania® 31 Weekend Events, DHS team completed a "Venue Enforcement Report."  Attached hereto as Exhibit 4 are true and correct copies of the "Venue Enforcement Reports" completed by WWE's enforcement team for the Defendants served.

23.     Attached hereto as Exhibit 5 is a PowerPoint presentation that I created after the WrestleMania® 31 Weekend Events.  The presentation illustrates the counterfeit merchandise that WWE seized during the WrestleMania® 31 Weekend Events pursuant to the Northern District of California's Order.

24.     I was in Dallas and Arlington, Texas from March 29, 2016 through April 5, 2016 for WrestleMania® 32 Weekend Events.  I worked with local law enforcement who WWE engaged to enforce the Ex Parte TRO and Seizure Order issued by the District Court for the Northern District of Texas.

25.     In working with local law enforcement, who insisted on making arrests instead of serving and enforcing the court's TRO and Seizure Order, I personally viewed the counterfeiters and assisted law enforcement to identify the counterfeit merchandise that was being sold during the WrestleMania® 32 Weekend Events.  I personally witnessed one individual who admitted to having travelled from Florida to Texas solely to peddle his counterfeit wares at the WWE event.  He was arrested just before WrestleMania® 32 event for selling counterfeit WWE shirts in a nearby parking lot.  While the WrestleMania® 32 event was taking place, he was processed and released by local law enforcement.  This same individual was then back out in the parking lot of AT&T Stadium at the conclusion of the WrestleMania® 32 event, selling the identical shirts he had been selling before his arrest only hours before.

26.     Attached hereto as Exhibit 6 is a PowerPoint presentation that I created to document the counterfeit activities I observed at the WrestleMania® 32 Weekend Events.  The presentation also illustrates the counterfeit merchandise that the local police in Dallas confiscated and some of the counterfeit merchandise that

WWE encountered leading up to the WrestleMania® 32 Weekend Events and was able to seize pursuant to the nationwide seizure order entered by the District Court in California.  In addition, the exhibit includes pictures of counterfeit merchandise that followed WWE around at its 2016-2017 Live Events after the WrestleMania® 32 Weekend Events, including identical counterfeit shirts promotion the "Road to WrestleMania" that were sold at WWE Live Events in Minnesota, New York and Michigan.

27.    I was in Orlando, Florida from March 30, 2017 through April 4, 2017 for WrestleMania® 33 Weekend Events to assist local law enforcement who WWE engaged to enforce the Ex Parte TRO and Seizure Order issued by the District Court for the Middle District of Florida.

28.    Attached hereto as Exhibit 7 is a PowerPoint presentation that I created to document the counterfeit activities I observed at the WrestleMania® 33 Weekend Events.  In addition, I have included pictures of counterfeit merchandise that has been following WWE around at its 2017-2018 Live Events since the WrestleMania® 33 Weekend Events, including identical counterfeit "WWE® Live" shirts that display counterfeit WWE Marks and Superstars on the front and a list of WWE® Live events from January through April on the back, including listing the WrestleMania® 34 Event in New Orleans and that were sold in different cities in the United States where WWE® Live Events have occurred.

29.     I was in New Orleans, Louisiana from April 5, 2018 through April 10, 2018 for WrestleMania® 34 Weekend Events to assist local law enforcement who WWE engaged to enforce the Ex Parte TRO and Seizure Order issued by the Eastern District of Louisiana.  However, due to the large police presence, we did not seize any goods. Despite that, WWE still encountered numerous counterfeit goods following WrestleMania® 34 during the 2018-2019 Live Events.

30.     Attached hereto as Exhibit 8 is a PowerPoint presentation of counterfeit merchandise that has been following WWE around at its 2018-2019 Live Events since WrestleMania® 34 Weekend Events, including counterfeit "WWE® Live" shirts that display counterfeit WWE Marks and Superstars on the front and a list of WWE® Live events on the back, including listing the WrestleMania® 35 Event in East Rutherford, New Jersey.

31.     Based on my first-hand experiences recounted above, the modus operandi of the counterfeiters operating during WWE's WrestleMania® Weekend Events includes offering to sell the counterfeit merchandise inside the venues where the events were being held, in front of the venues where the events were being held as well as in surrounding streets, in parking areas near the WWE events, areas where traffic becomes congested near the event, and areas between the parking areas and the event venues.

32.    In addition, after the WrestleMania® Weekend Events, counterfeiters will follow WWE's live events around the country selling the same or similar counterfeit merchandise.  For example, attached hereto as Exhibit 9 is a true and correct copy of an arrest report from a WWE live event in Oklahoma City, Oklahoma, on February 6, 2012 pursuant to the Preliminary Injunction and Order of Seizure entered by the District Court for the Southern District of Florida.  The officer seized 27 bootleg WWE T-shirts from the counterfeiter.  The counterfeiter, who claimed to be from Las Vegas, Nevada, admitted to the arresting officer that he was standing outside the venue next to a line of people to sell unauthorized WWE T-shirts and that he "follows the WWE around" to sell the T-shirts.

33.    Attached hereto as Exhibit 10 is a true and correct copy of photographs of counterfeit merchandise that WWE seized pursuant to the Preliminary Injunction and Order of Seizure entered by this Court after WrestleMania® 29 in East Rutherford, New Jersey.  WWE seized the merchandise from various cities on different dates, from different people and yet the artwork on the counterfeit merchandise was identical.  WWE does not sell any merchandise that includes this artwork, so the designs were not copied from WWE.  Based upon WWE's observation of the unauthorized merchandise sold at WWE live events and the common designs of the merchandise, I believe that the unauthorized

merchandise being sold at WWE's live events throughout the country emanates from only a few sources.

34.   WWE is currently promoting and will be presenting a multi-city presentation of live wrestling entertainment events throughout the United States and in many other cities throughout the world beginning on April 5, 2019 and ending on March 30, 2020 (the last currently scheduled WWE® live event before WrestleMania® 36) ("WWE's 2019-2020 Live Events").  WWE's 2019-2020 Live Events include WWE's WrestleMania® 35 event which will take place on April 7 at MetLife Stadium.   In addition to the WrestleMania® 35 event, there will be additional WWE-sponsored activities related to the WrestleMania® 35, such as meet and greets with its Superstars, that will occur on April 5 and 6, 2019 in other parts of New Jersey (the "WrestleMania® 35 Weekend Events").[1]

35.   The operation of the WWE's 2019-2020 Live Events, including the WrestleMania® 35 Weekend Events, will include, as in the past, offering for sale souvenirs, merchandise and memorabilia bearing trademarks, service marks and logos of WWE (the "WWE Marks").  The WWE live events in past series have

---

[1] WWE will be hosting additional WrestleMania® 35 weekend events in New York, including WWE's NXT Blacklist, WWE's NXT Takeover New York, WWE's Hall of Fame Brooklyn, WWE's RAW Brooklyn, and WWE's Smackdown Brooklyn.  However, WWE's request for a TRO is limited to events that will take place in this District including WrestleMania® 35 at MetLife Stadium in East Rutherford, New Jersey.

attracted, and are certain to continue attracting, the attention of dealers and vendors of merchandise bearing counterfeits of the WWE Marks.  In fact, as shown in Exhibit 8, WWE has already encountered **identical** counterfeit merchandise with WWE Live Event tour dates from January 2018 through the WrestleMania® 35 Weekend Event in different cities across the United States.

36.     Based on my experience detailed above, I expect individuals and groups (hereinafter "Counterfeiters") who, without permission or authorization, misappropriate the WWE Marks for use on counterfeit merchandise (the "Counterfeit Merchandise") to be selling Counterfeit Merchandise at WWE's WrestleMania® 35 Weekend Events from April 5 through April 7, 2019 in this District and I have every reason to believe that they will continue to do so throughout WWE's 2019-2020 Live Events.

37.     Based on my experience, the Counterfeiters sell to the general public to cash in on the enormous commercial value and goodwill contained in, and conveyed by, the WWE Marks.  The Counterfeit Merchandise will consist of similar designs that appear at different cities throughout the United States, indicating that the Counterfeit Merchandise is emanating from a common source. In fact, some Counterfeit Merchandise display the dates of various WWE live events making it simple for the Counterfeiters to use the same Counterfeit Merchandise at various WWE live events across United States.

38.    Based on my past experience and the activity that I understand has been occurring at recent WWE live events, the Counterfeiters will travel from city to city selling Counterfeit Merchandise at WWE events.   For example, two Defendants in the 2012 case before the Southern District of Florida, Thomas Keane and "Butch" Thomas Ingram, had been previously served at WrestleMania® 24 in Orlando, Florida in April 2008, pursuant to an Ex Parte TRO and Seizure Order. In addition, two Defendants in the 2014 case before the Eastern District of Louisiana had been previously served in a different state entirely -- at WrestleMania® 28 in Miami, Florida in 2012 pursuant to an Ex Parte TRO and Seizure Order from the District Court for the Southern District of Florida.  None of these Defendants ever made an appearance in court to contest the seizure or otherwise respond to WWE's allegations.

39.    Based on WWE's enforcement of prior Seizure Orders, I have inspected unauthorized merchandise sold by Counterfeiters.  The design, materials and quality of all of the unauthorized merchandise sold by the Counterfeiters is poor and generally uniform from item to item.

40.    Sales of goods bearing counterfeit marks reduce the demand for genuine goods and result in lost sales to WWE that can never be recouped because (a) the Counterfeiters have no regular place of business; and (b) the identity of

itinerant Counterfeiters cannot readily be ascertained, and therefore Counterfeiters are not subject to ordinary legal remedies.

41.    Based on my firsthand experiences described above, there is no doubt that the Temporary Restraining Order and Seizure Order now requested by WWE will be essential tools in retaining control over the unlawful distribution and sale of Counterfeit Merchandise during the WrestleMania® 35 Weekend Events in the East Rutherford, New Jersey area.  I fully believe that the large-scale counterfeiting activities that I have personally witnessed at prior WrestleMania® events, which would have proceeded largely unabated if WWE had been denied the protections of the Temporary Restraining Orders and Orders of Seizure, will reoccur in the East Rutherford, New Jersey area.  Thus, I believe the orders are necessary to enable WWE to effectively coordinate and execute its efforts to protect its genuine trademarks.

42.    Based on my firsthand experiences in this District, Arlington, Dallas, Santa Clara, San Jose, New Orleans, Miami, Atlanta and Orlando and WWE's prior experiences, the Counterfeiters are part of one or more nationwide counterfeiting rings wherein large volumes of counterfeit merchandise is created in advance of a WWE pay-per-view event, such as the upcoming WrestleMania® 35 event in East Rutherford, New Jersey.  After the pay-per-view event has ended, the Counterfeiters will travel to upcoming WWE live events in other parts of the

United States with the remaining counterfeit merchandise, setup at these live events and continue to sell the counterfeit merchandise. They will also continue to produce and sell new WWE-branded counterfeit merchandise.

43.    As described above, the Counterfeiters that WWE has encountered distribute and sell Counterfeit Merchandise at event venues, in surrounding parking lots, on surrounding streets and in local areas where WWE fans are likely to be, such as local area hotels. At many venues, for example, traffic backs up before and after the event as attendees approach and leave the venue and its parking areas. To avoid enforcement near the venue, Counterfeiters distribute and sell Counterfeit Merchandise on foot to customers in cars waiting in these traffic back-ups.

44.    In order to effectively protect WWE's rights, it is necessary for trademark enforcement efforts to begin the day before the actual events that will be the focus of Counterfeiters' infringing activities. Based on my experience, I believe that Counterfeit Merchandise will often begin to enter the local areas in large amounts the day before each event. Therefore, to most effectively protect WWE's rights, the trademark enforcement efforts, including the investigation of likely manufacturing, distributing and retail locations and the identification of persons and equipment being used to transport Counterfeit Merchandise from manufacturers to retailers and peddlers, should begin 24 hours before each event.

45.   Similarly, it is necessary for trademark enforcement efforts to continue through the day following the actual events that will be the focus of Counterfeiters' infringing activities.   Based on my experience, I believe that Counterfeiters often will gather the next day to distribute Counterfeit Merchandise and coordinate further counterfeiting activity.   Therefore, to most effectively protect WWE's rights, the trademark enforcement efforts, including the investigation of likely manufacturing, distributing and retail locations and the identification of persons and equipment being used to transport Counterfeit Merchandise from manufacturers to retailers and peddlers, should continue 24 hours after each event.

46.   Allowing WWE to seize counterfeit goods at and around live event venues enables WWE to discover and investigate at least, the local source manufacturers and distributors of Counterfeit Merchandise.

47.   As a result of its ability to seize Counterfeit Merchandise at live events, WWE successfully has avoided live event sales that otherwise would have resulted from the distribution of Counterfeit Merchandise by a given source. Enforcement in this manner is the optimal, most judicially and practically efficient means of combating merchandise counterfeiting, and it is possible only via the ex parte seizure process.

48.     As demonstrated, the ex parte seizure process has aided WWE tremendously in bringing counterfeiting under a measure of control, and any hopes of WWE retaining such control over the unlawful distribution and sale of Counterfeit Merchandise at live events and elsewhere, and thereby effectively protecting its intellectual property rights, rests upon the continued availability of ex parte seizure relief.

49.     I understand that of the scores of Counterfeiters served under various orders of seizure in the past, very few identified themselves, and not a single one registered an objection with the court in connection therewith.   It is my understanding that Counterfeiters who have been caught prefer instead to cooperate peacefully and simply turn over their illegal merchandise without incident and lie low until a WWE live event in the future, hoping next time to evade enforcement.

50.     Genuine WWE goods are of the highest quality and grade and all such authentic WWE Merchandise bears an official label or other indicia of authenticity. Counterfeit Merchandise does not.  It is typical for the goods bearing counterfeit marks to be lower in price and quality than goods bearing genuine marks.  Because the quality of materials used by the Counterfeiters is not and cannot controlled by WWE, I understand that there is a safety risk to the public with regard to the materials that are actually used to manufacture the Counterfeit Merchandise (e.g.,

the Counterfeit Merchandise does not meet flammability standards).  In fact, at the Preliminary Injunction hearing before the District Court for the Southern District of Florida in 2012, the Court when presented with the Counterfeit Merchandise that was seized noted the very strong chemical odor emanating from shirts, remarking that the Court did not "even have to have it close to my nose" to notice the smell.  See Ex. 1 at 32-33.  In addition, as a large percentage of the Counterfeit Merchandise is intentionally child-sized, there is a particular safety risk to children for whom parents might unknowingly purchase these inferior quality and potentially dangerous shirts.

51.    If Counterfeiters are permitted to sell goods bearing counterfeit marks, WWE will be irreparably harmed by the inferior quality counterfeit merchandise, as (i) WWE's reputation for the manufacture and sale of only the highest quality souvenirs, merchandise and memorabilia will be tarnished, and (ii) the company's well-established and invaluable customer goodwill and confidence will be eroded.

52.    Indeed, unless goods bearing counterfeit marks are seized from the Counterfeiters, such goods will enter the marketplace to the permanent, irreparable detriment of WWE and pose a safety risk to the public.

53.    If the Counterfeiters are alerted to the existence of this action or WWE's motion for Temporary Restraining Order and ex parte Seizure Order, I

believe they will conceal or otherwise render the goods bearing counterfeit marks

inaccessible to the Court but still available for future distribution and sale.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of March, 2019 in Stamford, Connecticut.

Lauren A. Dienes-Middlen
Senior Vice President, Assistant General Counsel
Intellectual Property, Business and Legal Affairs
World Wrestling Entertainment, Inc.