# EXHIBIT 1
# to Declaration of Lauren Dienes-Middlen, Esq.

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
                    MIAMI DIVISION
                Case No. 12-21018-CV-SEITZ
```

WORLD WRESTLING ENTERTAINMENT, INC.    MIAMI, FLORIDA
                    Plaintiff,

                                       April 3, 2012
        Versus                         VOLUME I

                                       PAGE 1 TO 49

DANIEL ROSHAWN THOMAS, ET AL.
                    Defendants


                    PRELIMINARY INJUNCTION
            BEFORE THE HON. PATRICIA A. SEITZ, J.
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:

                    JONATHAN B. MORTON, ESQ.
                    ROBERT C. LEITNER, II, ESQ.
                    K&L Gates LLP
                    Wachovia Financial Center
                    200 S. Biscayne Boulevard - 39th Floor
                    Miami, FL  33131-2399


FOR THE DEFENDANT:

                    NO APPEARANCES




REPORTED BY:        DAVID S. EHRLICH, RPR
                    Official Court Reporter
                    Wilkie D. Ferguson, Jr.
                    U. S. Courthouse
                    400 N. Miami, Room 11-4
                    Miami, Florida 33128-1810
                    (305) 523-5537

(Court reconvened at 10:03 a.m.)

2    LAW CLERK:  Case Number 12-21018, World Wrestling

3 Entertainment, Inc. Vs. Daniel Roshawn Thomas, et al.

4    MR. MORTON:  Hello, Your Honor.

5    THE COURT:  Can you state your appearance, please?

6    MR. MORTON:  Yes.  Jonathan Morton and Rob Leitner from the

7 law firm of K&L Gates representing the WWE, and Lauren

8 Dienes-Middlen from the WWE.

9    THE COURT:  Okay.  Please have a seat.

10    It is four minutes after ten.  This hearing was set to

11 commence at ten o'clock to the named and unnamed defendants to show

12 cause why a preliminary injunction should not be entered.

13    At this time, Mr. Morton, if you would like to put on your

14 witness to establish the basis for a preliminary injunction, I'll be

15 happy to hear that.

16    Let the record reflect that there's no one here in the

17 courtroom.  I believe we can -- The courtroom is unlocked, correct,

18 Officer?

19    COURT SECURITY OFFICER:  Yes, Your Honor.

20    THE COURT:  And I'm going to enter an order unsealing all

21 of the matters that have thus far been under seal.

22    MR. MORTON:  Okay.  Thank you, Your Honor.

23    THE COURT:  And if you've got a copy of that order with

24 you, I'll sign it.

25    What I need to know are greater specifics.  I received your

1  proposed preliminary injunction order, and let me share with you a

2  couple of thoughts before we commence.

3            MR. MORTON:  Sure.

4            THE COURT:  I need to have more facts as to the particular

5  seizures, the particular people that were identified, what was

6  seized, where it was seized, those kinds of details.  I don't have

7  any of that yet.

8            Secondly, I did look at the law that you provided as far as

9  a nationwide injunction, but it is not appropriate under the law to

10 have a nationwide seizure order, because the statute is very

11 particular as to the duration of a seizure order and the

12 particularities that have to be satisfied before a seizure order can

13 issue.  So, you'll have to do it in every single jurisdiction.

14           MR. MORTON:  Okay, Your Honor.  I'd like to make some

15 argument on that, Your Honor, if --

16           THE COURT:  I don't think you're going to be able to change

17 my mind, but I'll always hear you.  The statute really precludes it.

18           MR. MORTON:  Well, Your Honor, a couple things on the

19 statute.  If you look at --

20           THE COURT:  I'm looking at 15 U.S.C. 1116(d)(5).

21           MR. MORTON:  Okay, Your Honor.  If you go to -- 1116(d) is

22 definitely the controlling issue in this case.  And if you look at

23 two things on 1116, one, of course, is 1116(a) which talks about a

24 nationwide injunction.  It definitely provides the Court with the

25 right to give a permanent injunction nationwide.

1          Second, Your Honor, if you look at 1116(10)(A), that it's

2 interesting in the fact what it talks about is the fact that upon a

3 hearing such as this --

4          THE COURT:  Unless waived by all the parties.

5          MR. MORTON:  Well, I'm -- let me go to the part that is in

6 1116(a).  It also talks about the fact that if a Court finds that

7 there's failure of proof, that the Court could dissolve or modify

8 the order, which seems to indicate certainly if there was a proof,

9 you can modify a seizure order, but it also implicitly states then

10 that, of course, if we make the proof, that we keep the seizure

11 order.

12          And I'd like to cite you, also, to the one Circuit Court

13 that's discussed this issue -- most of these cases haven't gone up

14 to a Circuit Court, but the Third Circuit --

15          THE COURT:  Did you bring copies of that decision?

16          MR. MORTON:  Yes, Your Honor.  It's in our papers, but I

17 have copies too.

18          In this case -- It's called Vuitton vs. White.

19          THE COURT:  How do you spell it?

20          MR. MORTON:  V-U-I-T-T-O-N.

21          THE COURT:  Oh, Louis Vuitton.  Okay.

22          MR. MORTON:  Yeah, Louis Vuitton vs. White, right.  And

23 that case involved a -- It did involve only a TRO, in which the

24 Court felt he didn't have power to enter a seizure order.  It dealt

25 with a TRO.

1          (Off-the-record discussion.)

2          MR. MORTON:  Let me slow down, Your Honor.  I apologize for

3 that.

4          What happened in this case -- This was a Third Circuit

5 case, and what happened was the District Court refused to enter a

6 TRO, and Louis Vuitton, the counsel, they decided to appeal.  And

7 what the Court looked at was whether or not it had the power to

8 enter into a seizure order, and it found that it did.  And what it

9 found, what I found interesting, and one of the things that we'd

10 like to show the Court, was --

11          THE COURT:  Give me a copy of the case.

12          MR. MORTON:  I do have a copy.  I had my highlights on it.

13          THE COURT:  You didn't bring me an extra copy?  You didn't

14 bring me an extra copy, if you were going to be citing it?

15          Just give me the cite.  I'll pull it up.

16          MR. MORTON:  The cite, Your Honor, is 945 F.2d 569.

17          If you look at the bottom of the first column as it goes

18 into the second column, the Court discusses what is the difference

19 between injunction and seizure order, and what it finds is that

20 if -- The Court found that what Congress meant when discussing the

21 injunction was also a seizure order.  The seizure order is part of

22 the injunctive relief that a Court can grant.

23          Now, again, it was part of a TRO, but I think that language

24 is instructive.  And I think it's part of -- you know, I think when

25 courts have looked at the statute, they have found that they can

1  use -- that when Congress passed and said you can have an injunction

2  nationwide, that it certainly meant to have a seizure order, because

3  without a seizure order in these type of cases, then there would

4  really be no relief.  In fact, that Court discusses the fact that

5  without a seizure order, the plaintiffs, such as WWE, or any concert

6  tour, or anybody dealing with bootleggers, would have no remedy.

7  And that was the other case that we cited, the SKS Merchandise case,

8  where the Court found the same thing.

9        And I understand that -- We also cited a lot of other cases

10  that have all come to the same conclusion, that without the seizure

11  order, there really is no relief for the WWE.

12        We can talk more about the factual issues behind that, if

13  you would like some testimony on that, but as you see here, we

14  served folks.  In fact, we served a number of folks multiple times,

15  even during this weekend, in multiple events.  They keep coming back

16  with the same merchandise.  The address that they were given are

17  from all over the country, and they'll be following this tour

18  around.  Without a seizure order, there really is no relief.  We can

19  serve them as many times as we want to, but they're not going to

20  show up.  We're not going to have a remedy against these people.

21        If you look at the purpose behind 1116(d), it would seem

22  very strange that Congress would say you could have a seizure order

23  for locally, for ten days, but then you couldn't have one as you're

24  going around on the nationwide tour.  It would really leave us

25  without a remedy.

1        You suggested we could file in each city, but I don't think

2 that's what Congress intended, and it's also not what can be done on

3 a practical basis.  It's cost prohibitive.  It takes time and effort

4 to educate a judge and to come here and to write our papers and to

5 get a temporary injunction.  And the amount of counterfeit goods

6 that are seized at one event doesn't justify it.

7        Now, it does justify -- We're still not going to be able to

8 probably get back what we spent on this -- at this hearing

9 nationwide, but at least it gives us some ability to take -- to get

10 counterfeit goods off the street and to get them away from kids and

11 to protect the safety and the integrity of our marks and also the

12 safety of our fans.

13        So, I don't think there is anywhere in the statute or any

14 intent on Congress to say, when they looked at this problem and

15 looked at this issue and found that a seizure order was the only

16 remedy, that it was only a remedy that we could get was for a

17 Temporary Restraining Order (sic), but that we couldn't get the same

18 type of seizure order through injunctive relief on a nationwide

19 basis.

20        THE COURT:  I'm looking at the statute.  Do you have a copy

21 of the statute in front of you?

22        MR. MORTON:  Yes, I do.

23        THE COURT:  If you would look at 15 U.S.C. 1116(d)(5), and

24 it states:  "An order under this subsection shall set forth, A, the

25 findings and facts and conclusions of law required for the order; B,

1 the particular description of the matter to be seized and a

2 description of each place at which such matter is to be seized; and,

3 C, the time period, which shall end not later than seven days after

4 the date on which the order is issued during which seizure is to be

5 made; and, D, the amount of security required to be provided under

6 this subsection; and, E, a date for hearing required under

7 paragraph 10 of this subsection."

8          So, all of those contemplate that a seizure order goes hand

9 in hand with a TRO for the particular event that is occurring.  And

10 it needs to be specific as to what exactly you're seeking to seize,

11 where it's going to be seized, and that the order does not last more

12 than seven days.

13          I can't ignore the clear letter of the law.

14          MR. MORTON:  That's right, Your Honor.  But then you look

15 at what happened, and that's --

16          THE COURT:  And TROs are different from injunctions, and a

17 seizure order is the equivalent of an injunction.  It's the same

18 thing as authorizing a search warrant.  And any search warrant that

19 you authorize for law enforcement has to be very particularized.  It

20 isn't just a blanket search warrant that says you can go out

21 anywhere in the country and wherever you find people violating the

22 law, you can stop and arrest them -- I mean stop and seize their

23 stuff.  I don't have that case, and you haven't made that case for

24 me that I can ignore this clear letter of the law.

25          MR. MORTON:  Well, two answers, Your Honor.

1          First, we've cited a number of cases which have found that

2     such relief is permitted, and we cited those to you.

3          THE COURT:  But there's a distinction between an injunction

4     and a seizure order.  I haven't had a chance to study the case

5     Vuitton vs. White, at 945 F.2d 569, 1991, which you say is a Third

6     Circuit decision, in light of the argument that you're now making.

7     I'll be happy to go back and read it.

8          MR. MORTON:  We also cited the SKS Merchandise case at

9     233 F.Supp.2d 841, which also provides that preliminary injunction

10    may be enforced by the seizure of any merchandise and consistent

11    with any other applicable laws.

12          So, in the SKS Merchandise case that we cited to you, it

13    did permit a preliminary injunction through the issue of a seizure

14    order.  So, there is case law out there that supports that, and I

15    believe we cited some other cases, unpublished decisions, that also

16    allowed for seizures on a nationwide basis.  I think those were

17    cases that we sent to you along with our -- in our packet with the

18    TRO motion.

19          And I'd also like, again, to cite to you, as far as the

20    statute goes, is at Section (10)(A), which talks about what occurs

21    at this hearing.  And the hearing definitely states that the seizure

22    order can be dissolved or modified upon a lack of proof.  But I

23    think that's an indication that upon the making of proof, which I

24    believe we will do here, that a seizure order is appropriate after

25    this for preliminary injunction purposes.

1          THE COURT:  Give me the authorities that say clearly that

2 that's what I can do.

3          MR. MORTON:  Okay, Your Honor.  I cited that case, but we

4 can certainly give you a memo or, if you want to, a list of cases

5 which have permitted this -- permitted seizure orders --

6          THE COURT:  I think you've already given me -- You're not

7 going to give me anything different than what you've put in your

8 motion for your Temporary Restraining Order, are you?

9          MR. MORTON:  No, Your Honor.

10          THE COURT:  So, why do you need to give me anything else?

11 If you've got something new, I'm happy to hear it.  I'm just not

12 persuaded that I have the authority to grant what you are asking me

13 to grant.

14          I understand the logic.  I can see how it is more cost

15 efficient to you to have that.  It's just I'm looking at the statute

16 that Congress wrote.

17          Remember, I'm not an activist judge.

18          MR. MORTON:  I understand that, Your Honor.  And I do think

19 the plain language -- And that's why I wanted to cite you to

20 Section (10)(A).  I think the plain language does allow you to issue

21 a seizure order as part of the injunction.  And that's why we cited

22 to the Third Circuit.

23          THE COURT:  But what particular part of (10)(A) that

24 specifically says the Court can issue a seizure order nationwide?

25          MR. MORTON:  Well, Your Honor, what it says in (10)(A) is

1  we have the hearing, and then it states if that party -- and at the

2  last sentence of (10)(A), it says if that party "fails to meet the

3  burden at the hearing, the seizure order shall be dissolved or

4  modified appropriately."

5          So, it seems to me, Your Honor, if we didn't meet our

6  proof, and you could modify the seizure orders in the preliminary

7  injunction, then certainly if we didn't meet our burden, which we

8  will today, then you could enter a seizure order.

9          THE COURT:  But I've already entered a seizure order, and

10  I'm permitting you to keep and destroy what has already been seized.

11          MR. MORTON:  Right.  And what we're asking for, Your Honor,

12  is to have that seizure order as part of the preliminary injunction

13  going forward against -- we have named defendants, certainly going

14  against them, and all people acting in active concert and

15  participation, as provided by Rule 65.

16          THE COURT:  But you want to seize things in other states.

17          MR. MORTON:  Correct, Your Honor.

18          THE COURT:  How do you enforce that seizure order?  Making

19  them come to Florida?  I don't think so.  And I have no control over

20  you that you're not going beyond the limits of the seizure order.

21  And my seizure order was only four locations here in Miami.

22          MR. MORTON:  Well, that's correct, Your Honor.  And

23  certainly as part of the preliminary injunction order -- Well, I

24  would respond two ways.

25          First of all, the defendants that we did serve were here.

1 So, for those people, ordering an injunctive relief, they have been

2 here, and if we wind up seizing other jurisdictions, you certainly

3 have personal jurisdiction.  They were here.  They were served here.

4 You certainly have personal jurisdiction over them.

5         Second, if you wish, Your Honor, to put into the

6 preliminary injunction the fact that if somebody wants to contest --

7 which we'll have testimony that nobody has ever contested these

8 things, because that's part of the issue here and part of what the

9 findings of Congress were, that people don't show up.  That's the

10 issue.  But if you wanted to give extra protection, we would

11 certainly consent that if we were to serve somebody outside this

12 jurisdiction, and they wanted to contest, that we would be willing

13 to contest and move this case or have it transferred for purposes of

14 contesting that -- a seizure in the jurisdiction in which they are

15 located.

16         THE COURT:  And by what vehicle do you do that to change

17 venue?

18         MR. MORTON:  We could do it by a motion -- by a transfer

19 motion or whatever vehicle this Court finds.

20         THE COURT:  Have you done that before?

21         MR. MORTON:  No, Your Honor, because nobody has ever shown.

22 I mean that's really the crux of the issue here, and that's the crux

23 of why the statute was passed, is because they don't show.  I mean,

24 if -- We can put testimony on, and maybe we can continue this

25 argument -- the legal issues after we hear the factual testimony,

1   but the problem is they don't show up.

2          The way it works now is, they send out -- the

3   counterfeiters send out folks with a limited number of counterfeit

4   goods.  And they get approached, and they know if they cause an

5   incident, they could get arrested.  So, they don't.  What they do is

6   they turn over the goods, we get them, they go back, they either get

7   more goods, and they come back and they sell again.  The testimony

8   will show we had at least four people who we served on multiple

9   occasions.  They're never going to --

10          THE COURT:  Why didn't you see them and get them arrested

11   for violation of the court order?  Why didn't you ask to have them

12   arrested?

13          MR. MORTON:  We had a seizure order, Your Honor, so we

14   served them, and we seized their property.

15          But the real problem we have here is the fact that we

16   can't -- They go -- They're not going to contest, because they don't

17   need to contest and they don't want to contest.  They're probably

18   giving us -- History shows they give us fake addresses.  There's

19   just no relief that we can get.

20          And these are also people who are just -- They're the ones

21   who actually are selling the goods.  It may not be the people who

22   are actually manufacturing are behind this.  They're at these big

23   events, we can't track them, and that's the issue.  And that's what

24   Congress found.  That's why I cited that one case to you, because

25   that is the issue here and that is the problem here.  And I don't

1 think Congress, when dealing with this issue, meant for it only to

2 be a temporary seizure and to require us to do this at every single

3 jurisdiction.  I don't think that would be --

4           THE COURT:  Why wouldn't Louis Vuitton coming in and having

5 a seizure at a particular site here, why then did they have to file

6 any suit in the state of Washington or the state of California if

7 your principle was the viable one?  As I understand it, Louis

8 Vuitton still may have gotten a seizure order for seizing here, but

9 then goes off --

10          MR. MORTON:  Correct.

11          THE COURT:  -- and their products are sold nationwide.

12          MR. MORTON:  Correct.  And I don't know Louis Vuitton's

13 business, but let's presume what they're interested in is not a

14 tour, but certainly Louis Vuitton -- I don't know -- has a certain

15 market.  So, maybe there's one -- a market in Miami, there's a

16 market in Seattle, Washington, a market in Omaha, Nebraska, and

17 they'll have to go to each jurisdiction for those markets.  And that

18 may be what they do.  I don't represent Louis Vuitton.  I've not

19 thought through their legal issues.

20          Our issues are different than Louis Vuitton's, though,

21 because we have a nationwide tour.  And we have folks who are

22 following our tour and who are selling these counterfeit goods.  And

23 that's the market that we are -- Those are the folks that we are

24 trying to prevent from counterfeiting, and those are the folks who

25 we're asking for an injunction against and -- against those folks

1  and people in active concert with those folks.  They have been here

2  in Florida.  They clearly, I think, have a right under -- to do

3  nationwide injunctive relief.

4         I believe, also, under the statute, that I don't think the

5  Congress meant for us to have injunctive relief where we go and say,

6  "We have an injunction against you," but what is that really going

7  to get us?  It doesn't get us relief.  And that's what the

8  SKS Merchandise case really discussed, is the fact that it doesn't

9  get us relief.  And the Court found there that why the Congress

10  passed the statute was to give relief.  And courts have found, even

11  before the statute was passed, in some of the cases we cited, that I

12  think the Court has also some equitable powers too.  I think at the

13  end of the day, mostly with the statute, is that the statute was

14  there to provide relief.  Reading it the way this Court will read it

15  will really provide us some limited relief, and we appreciate the

16  relief down here in Miami, and we thank you for that, but it doesn't

17  provide us with relief that is needed, which is to protect

18  counterfeiting on our tour.

19         As we'll go through the testimony, this tour moves very

20  quickly from city to city to city, and I see nothing in the case law

21  anywhere which has required a concert tour or a WWE tour, or

22  whatever the tour is, to go to city to city to city to do this.

23         What that SKS Merchandise case discussed, and the other

24  cases that we cited to you, and admittedly with not a lot of

25  analysis behind it, but they all reached the same conclusion that

1 this was the intent of Congress, and this is the relief that is

2 needed to protect against the counterfeiters.  Anything else simply

3 means that the counterfeiters are going to be able to continue

4 counterfeiting their goods against the WWE and selling them and

5 really leaving the WWE with no relief.

6           THE COURT:  Okay.  Let's hear the testimony.

7                 LAUREN DIENES-MIDDLEN, sworn.

8           **DIRECT EXAMINATION**

9           **BY MR. MORTON:**

10 Q.    Can you please state your name and address for the record?

11 A.    Lauren Dienes-Middlen.  My home address is 13 Lacy Lane, in

12 Norwalk, Connecticut.  Zip code is 06854.

13 Q.    And where are you currently employed?

14 A.    I'm currently the vice president of intellectual property at

15 World Wrestling Entertainment.

16 Q.    And have you been down here in Miami during the past weekend?

17 A.    Yes, I have.

18 Q.    And did you play any role in the seizure efforts during this

19 past weekend?

20 A.    Yes.  I was overseeing all of the off-duty officers hired to

21 enforce on the TRO.

22 Q.    And did you put together a PowerPoint presentation to help us

23 for this hearing?

24 A.    I did.  I gathered the evidence and took pictures and thought

25 it might be a bit of a visual aid to explain what happened this

1 weekend and how it worked.

2          MR. MORTON:  Your Honor, could we approach with the

3 PowerPoint, the demonstrative exhibit?

4          THE COURT:  Certainly.

5          MR. MORTON:  And I have one for the clerk, if she would

6 like one.

7          THE COURT:  Thank you.  Very thoughtful.

8          LAW CLERK:  Thank you.

9 Q.   If we could, let's just turn to the first page, which is

10 entitled "WrestleMania 2012, 78,363 attendees."

11      Can you tell us what this picture is?

12 A.   Sure.

13      This picture is for one part of Sun Life Stadium during the

14 WrestleMania event.  There were in attendance 78,363 attendees,

15 which came from all 50 states, as well as 36 different countries, to

16 attend this event.

17          THE COURT:  How do you know that?

18          THE WITNESS:  I know that because I checked with the --

19 this morning, actually -- confirmed this information from the person

20 who was in charge of the WrestleMania events this weekend, and they

21 can tell from credit card receipts and credit card purchases where

22 the fans bought their tickets, from travel packages that we have put

23 together, where they have come from.

24          THE COURT:  Thank you.

25          THE WITNESS:  You're welcome.

A.    And I took this picture mainly to show the number -- the sheer

size of the event and the number of fans that attend the event.

Q.    And if we go to the second page, it shows a police presence.

Can you tell me about the police presence at the event?

A.    The -- I have to say Miami does a wonderful job with their

police force.  They were -- It was an extremely large police

presence at all of our events, and I tried to take some pictures to

evidence how they were in attendance at every entrance to any venue

that we had, and not just one car here, one car there, but in

multiple police cruisers, and out on the streets, and in every facet

and every location.  And one of the reasons I took these pictures is

to show how difficult it was for bootleggers to actually be open and

obvious while they were selling the counterfeit merchandise.

          THE COURT:  There are four pictures on this second page.

Starting in the upper left-hand corner and going clockwise, where

are those pictures taken?

          THE WITNESS:  All of these pictures, Your Honor, are

outside and near the Sun Life Stadium.

          THE COURT:  So, all four pictures at the Sun Life Stadium.

          THE WITNESS:  That's correct.

          THE COURT:  And that was for the Sunday event.

          THE WITNESS:  Correct.

          THE COURT:  Okay.

A.    And I've confirmed with Rich Herring, who was at the video

conference at our trial earlier, that there were over 300 police

1   personnel coordinating and attending all the events.

2          THE COURT:  This was just at the Sun Life.

3          THE WITNESS:  300 throughout the weekend.  There were

4   definitely about 200 during the Sun Life Stadium event itself.  But

5   just to clarify, they were not there for bootleg enforcement; they

6   were there for crowd control and safety purposes.

7   Q.   That was going to be my next question, which was:  The police

8   did not help in any way with the seizure efforts; is that correct?

9   A.   No.

10  Q.   Okay.  And the next picture is also -- just shows -- Let me ask

11  you this question.  What does the next picture, on page 3, the next

12  three pictures show?  It says:  "On the roads leading to the events

13  as well."

14  A.   These three pictures are a little further away from the

15  stadium, roads leading to the stadium, and surrounding parking lot

16  areas to the stadium.  Again, for the WrestleMania event held on

17  Sunday.

18         THE COURT:  Are these police officers in the vests?

19         THE WITNESS:  Yes, they are.

20         THE COURT:  Or are they crowd control folks?

21         THE WITNESS:  They are police officers.

22  Q.   And the fourth picture, next slide, says:  "Counterfeiters were

23  found selling bootleg merchandise."

24         First of all, what is this a picture of?

25  A.   This is a picture of the convention center.  This is where

1 Axxess -- WrestleMania Axxess was held from Thursday, the 29th, up

2 until Sunday, the first.  And this --

3         THE COURT:  That was at Miami Beach, correct?

4         THE WITNESS:  Yes, that's correct, Your Honor.

5 A.   And the venue on the left, as you can see from my arrows, is

6 where the WrestleMania Axxess, which is that interactive fan

7 experience that we had -- that's that venue.

8      And on the right is one of the fan parking lots.  And if you

9 can see, the picture is a little dark, but in the middle is the

10 corner on the Axxess venue property where bootleggers were found

11 standing, although -- They tried to blend in with the crowd, because

12 there was such a police presence.  But we were able to spot them.

13        THE COURT:  Okay.

14 A.   And what's interesting is that -- and what's typical is that

15 the fans had to actually pass them from the parking lot into -- to

16 get inside the venue.  So, they had to pass by them, which made it a

17 prime location for them.

18 Q.   Okay.  Let's go to the next picture.

19 A.   This next picture is a picture I actually took of one of the

20 counterfeiters selling shirts.  This is at WrestleMania.  This is

21 across the street from WrestleMania, again, on the path leading from

22 one of the parking lots towards the Sun Life Stadium.  And if you

23 see those yellow lines above his waist and ankle, those are actually

24 police lines that they put up so that the fans have to stay on the

25 sidewalk; they can't walk on the street.  So, they actually have to

1  pass this guy again to get to the venue where the event will be

2  held.

3          THE COURT:  Did you find out this person's name?

4          THE WITNESS:  Unfortunately, no.  I took the picture, and I

5  believe he -- I know he saw me take the picture, and I called it in

6  to the head of the security who was working with us, and by the time

7  they got there, he was gone, blended in the crowd.  We believe we

8  saw him again later, couldn't catch him.

9  A.    But what is interesting is what he was saying.  He was holding

10  up the shirt, as you can see.  He has a bag on his left shoulder

11  containing the other shirts, and he was saying, "Get your

12  WrestleMania shirts here, half price here rather than inside."  And

13  people were buying from him, which is why I noticed.

14         When one person is standing in a crowd that's moving, and there

15  are people around him, my eye is trained now to notice that there's

16  some kind of activity that we need to look at.  So, I turned the car

17  around and made a U-turn and got the picture.

18  Q.    Then the next picture just shows --

19  A.    The next picture I took outside Sun Life Stadium, and this is

20  towards the end of the event.  We found that the counterfeit product

21  was being sold typically before the event, for hours leading up to

22  the events, not so much during the actual event, because the fans

23  are inside.  But then on what they call the "blowoff," which is a

24  term of art in this industry, which means that after people are

25  leaving the event going back to their cars, it's a quick sell.  Try

1  to run, try to sell whatever they have in inventory on their

2  shoulders at the moment.  And it's called a blowoff by undercover

3  police.  It's something I learned as well.

4      But they would sell in the parking lots, and they would sell on

5  the sidewalk as they're coming out.  And a lot of these is where we

6  get what's called the "drop and run," where they're not providing

7  any ID.  If they see one of our undercover or off-duty officers

8  approaching them with the packet, with the seizure order, they know

9  what it's about.  They just hand over the stuff and run.  They don't

10 stay to give ID.

11      But this is where they really try to sell it.  But it's very

12 difficult, because, as you can see, although the pictures are

13 somewhat dark, it's a crowded parking lot, and it's nighttime, and

14 it's very hard to find them and very hard to get them.  But we did

15 manage to get about 72 shirts last night, just in that time alone.

16          THE COURT:  So the event was still going on, on April 2nd?

17          THE WITNESS:  Last night was Raw.  I'm sorry.  Last night

18 was Raw.  This was Sunday night.  We did manage to get shirts that

19 night too.  I don't remember offhand how many were specifically at

20 the blowoff time versus how many were going in.

21          **BY MR. MORTON:**

22 Q.  Let's talk about the shirts.  I know we have some pictures here

23 in this PowerPoint, but we also brought in some shirts for the Court

24 to see.

25      We have two bags over here to my right.  Can you tell us --

1 There's a big bag and there's a smaller bag.  Can you tell us what

2 these two bags are?  And I'll lift them up so the Court can see.

3 A.    Sure.

4      These are merely one fraction of the number of shirts that we

5 saw.  We just couldn't physically carry them all into the courtroom.

6 They're in my trunk, actually, at the moment.  We have over 300

7 shirts that were seized.

8      The bag that Mr. Morton is holding up right now is one of the

9 bags that was seized last night.  And they're in bags because what

10 we have instructed our off-duty officers to do is -- I provide them

11 with the clear bags, and from each individual, they put it in a

12 single bag.  So, they're not commingled.

13      THE COURT:  Good.

14 A.    In that single bag, they put in what's called a "venue

15 enforcement form" -- which I know we've submitted to the Court, and

16 we have the originals here -- as well as the service of process.

17 And for each individual, that goes inside that plastic bag, until

18 it's handed over to me or to the attorneys.  And then we take that

19 out, put a note inside the bag as to which form that corresponds to,

20 so we know exactly which bag is seized from which individual and

21 which shirt they sold and how many of them they sold.

22      So, these are just from two individuals that you're seeing

23 right here.

24      MR. MORTON:  Your Honor, if I may be permitted, we do have

25 the affidavits of service from the law (sic) enforcement.  If I

1  could, I could approach and enter those into evidence?

2         THE COURT:  Okay.  How many affidavits are there?

3         MR. MORTON:  I have them right in front of me.

4         (Handing to the witness.)

5  A.   There were 14 different individuals served, but as you'll see,

6  there are more affidavits, because some were served more than once.

7         MR. MORTON:  And, Your Honor, there's two packets.  The

8  first, the larger packet, that starts with number one, are the ones

9  that were served before last night's Raw, and those have been

10 included in the proposed order that we sent to you.

11        The second smaller packet was what was seized last night,

12 during the event last night, which was between nine and 11 o'clock

13 last night, which was called the Raw event down at the American

14 Airlines Arena.

15        THE COURT:  I thought you said the large package was the

16 Raw.

17        MR. MORTON:  No.  The large packet was everything before

18 the Raw event, all the other events before last night, and that's

19 what we were able to put into the proposed order.  Last night -- The

20 smaller packet is what we seized last night during the Raw event.

21        LAW CLERK:  Those have not been filed in the docket.

22        THE COURT:  All of these will need to be filed.  I'm going

23 to give them back to you so that you can file them.

24        MR. MORTON:  Okay, Your Honor.

25        THE WITNESS:  And, Your Honor, if I might answer one of the

1   questions you asked earlier about individuals who were served more

2   than once.  There were different off-duty officers on staff at

3   different times, and they might not have realized that that person

4   had already been served.  It's only after we brought those forms

5   back and we were typing up the information on the lists that we were

6   able to compare and figure out, oh, this person was already served

7   earlier the other day.

8           THE COURT:  That is very important information as part of

9   your proof, so you need to organize that.  I'm not here to make your

10  case.  You're here to make the case.  But --

11          MR. MORTON:  We would like to ask about a few of these

12  people.

13          **BY MR. MORTON:**

14  Q.   One of these folks, Mr. Thomas Keane, was he served on multiple

15  occasions?

16  A.   He was served on multiple occasions.  And I believe he was the

17  one who had been served in the prior -- under prior seizure order

18  in -- I think it was 2008.  So, he's not only a repeat offender this

19  weekend, but he's coming back from other years.  And he had not

20  appeared in court to answer to anything then either.  And I don't

21  believe he will now.

22  Q.   And Mr. Keane, did he give -- Did you notice anything

23  interesting about the addresses that Mr. Keane gave?

24  A.   I believe they were different addresses each time that he

25  provided the --

1          THE COURT:  Mr. Who?

2          MR. MORTON:  Thomas Keane, K-E-A-N-E.

3          THE COURT:  I'm looking at Daniel R. Thomas, and you're

4   saying that there's --

5          THE WITNESS:  They're different, yeah.

6          THE COURT:  Mr. Thomas got served a number of times.

7          THE WITNESS:  Yes.

8          MR. MORTON:  Yeah, a bunch of them got served a number of

9   times.

10          THE WITNESS:  There was one individual, I believe, who was

11   served three times during the events.

12          **BY MR. MORTON:**

13   Q.   And how does that occur?  How does a person get served multiple

14   occasions?

15   A.   When the off-duty officers will locate them, again, they seize

16   all the merchandise on hand, and that's kind of key.  It's what they

17   have on hand.  They don't have their entire inventory with them,

18   because they probably know they're going to get seized.  And we take

19   everything they have.  We provide them with a packet, which I can

20   show you even the packet we give them, and it contains a receipt for

21   goods seized as well as a notice -- a service of process, a copy of

22   the order, the complaint, and the exhibits.  And then the officer

23   fills out, as well, the service of process as well as a venue

24   enforcement form listing how many shirts, the description of the

25   individual served, as well as what date, what time, and at what

1  event and location the service was made.

2  Q.   Did you have a chance to take a look at the shirts that were

3  seized and did you see anything that was interesting?

4        THE COURT:  Can I just ask one question?  Where was

5  Mr. Keane?  I have the -- two of them, but they don't say where he

6  was served.

7        THE WITNESS:  Not on the service of process, but on the

8  venue enforcement form.  There are two pages for each individual.

9        THE COURT:  Okay.  It just has his home address in

10 New York.  It doesn't say where he was served down here, other than,

11 I guess, the Sun Life Stadium?

12       THE WITNESS:  Yes.

13       MR. MORTON:  You're right, it says New York, and then if

14 you look at the second packet, he's also served at the Raw event,

15 and there's a different address for Mr. Keane.

16       THE COURT:  He gave a different address at the Raw event?

17       THE WITNESS:  That's correct.

18       MR. MORTON:  Correct.

19       THE COURT:  Northport, Florida, is the address at the Raw

20 event.

21       MR. MORTON:  Correct.

22       **BY MR. MORTON:**

23 Q.   Does the fact that he gives multiple addresses give pause to

24 whether or not either of those are correct?

25 A.   I was actually just going to say that.  We don't know if either

1  one is a legitimate address or his legitimate address.

2          THE COURT:  It's interesting to note that Mr. Ingram, who

3  is also one of the individuals served, lists an address of

4  Northport, Florida, as well, but a different street than Mr. Keane.

5          THE WITNESS:  Exactly.

6          THE COURT:  Have you done any kind of analysis to check to

7  see whether or not these are legitimate addresses?

8          THE WITNESS:  We haven't had time, Your Honor.

9          THE COURT:  Okay.

10 Q.   And did you notice where addresses were for other of the

11 defendants involved?  I think we have that --

12 A.   I have, actually, a list of all of the cities and states that

13 they were claiming to live in, whether they do or not.  It's

14 Gardena -- If you'd like, I could just quickly tell you.  Gardena,

15 California; Los Angeles, California; again Gardena, California;

16 Pasadena, California; Apple Valley, California; Santa Monica,

17 California; Davenport, Florida; Poughkeepsie, New York; Pembroke

18 Pines, Florida; again Pasadena; Apple Valley; Kissimmee, Florida;

19 Hollywood, Florida; Northport; and Ridgewood, New York, were all the

20 different locations that either are legitimate addresses or fake

21 IDs.  We don't know.

22 Q.   And while it's hard to determine whether or not these are fake

23 addresses, with regard to the shirts, was there anything that was

24 interesting that you saw that led you to believe that these shirts

25 may have come from or been used before?

1  A.   Absolutely.  If you turn to the following page -- Pardon me and

2  forgive me for not having put page numbers on the PowerPoint -- but

3  it's right after the photo of Sun Life Stadium, and it is entitled,

4  "Example of Countershirts (sic) Found."  That shirt, which we can

5  actually show you, was one of the shirts we came in with, before the

6  WrestleMania events, that had been seized in Fresno, California, at

7  an event there.  And it is the same identical shirt, front and back,

8  that was the most common shirt found during our events here.  So,

9  it's following us around.

10      And as you can see on the back of that shirt, it says "WWE

11  2012," and lists locations where we're going to be.  So, clearly,

12  it's proving that not only have they already followed us from

13  California here, but they will continue to follow us as the events

14  continue.

15  Q.   And do we have some of those shirts here with us today?

16  A.   We do.  We have the shirt that we brought in earlier from

17  Fresno, as well as one example of the shirt that was seized this

18  weekend.

19          MR. MORTON:  Your Honor, may it please the Court, may I

20  approach the witness with a box with the shirts so she can show you

21  some of those shirts?

22          THE COURT:  Yes.

23          THE WITNESS:  Your Honor, I don't know if you want me to

24  hand them to you or to somebody else to give to you?

25          THE COURT:  Just hold them up.

1          THE WITNESS:  This is the one that we brought in originally

2  from Fresno.

3          THE COURT:  That's the one from Fresno.

4          THE WITNESS:  Correct.  Before the WrestleMania events this

5  weekend.

6          And this is an example from one of the bags.  Same shirt,

7  same design, a little poorly made, as you can see on the bottom.

8          THE COURT:  Yes.  It's sort of cut off.

9          THE WITNESS:  Exactly.

10         THE COURT:  And that's a child's shirt.

11         THE WITNESS:  That was my next point.  Most of the shirts

12  we found were children's size.  This particular one, from the cut

13  label, says "youth," and I believe it's a size 5.  So, for a child

14  who's five.  So, most of the shirts that were being sold were geared

15  towards to be worn by children.

16         THE COURT:  What were they selling them for?  Did you find

17  that out?

18         THE WITNESS:  I know this one individual was selling it for

19  $10.  I don't know what the other prices were.  They typically range

20  between 10 and 20.  The original shirt -- Well, this isn't even a

21  copy of the original.  The original is a completely different

22  design, legitimate product.  We sell it for 30.

23         **BY MR. MORTON:**

24  Q.   As we're going through that, do many of the folks who we seize

25  shirts from -- were the shirts they were selling similar to each

1  other?

2  A.   They were completely similar to each other in both design,

3  sometimes the labels were similar to each other, even though the

4  individuals came from completely different states by themselves and

5  not even from Florida.

6       This has the same front as the other shirt that I just showed

7  you, but a different back.  It doesn't have the 12 with the dates.

8  It actually has the same image as the front, just in black and

9  white.

10       THE COURT:  Okay.

11  A.   But what's important about this image that they all seem to be

12  using, this isn't an image that is on any product that we have right

13  now.  And I'll go into it a little later.

14       But this individual up here (pointing), the blond, his name is

15  Brock Lesnar.  He hasn't been with WWE for many years.  He just

16  recently re-signed, but this shirt, seized in Fresno, with this

17  design, was well before he was signed back with WWE.  So, this isn't

18  a current image available on our website of anything.  So, it's more

19  than a coincidence that so many people are using this same image.

20       And if you notice --

21       THE COURT:  The individual that you pointed out of Brock

22  Lesnar -- that's B-R-O-C-K, Mr. Ehrlich, and last name

23  L-E-S-N-A-R -- as you look at the image, he is the blond on the

24  right in the back row.

25       MR. MORTON:  That's correct.

1  A.   And if you notice, that's already kind of coming apart, the

2  shirt, on the side.

3       This is another version of the same shirt with the same design

4  front and back.

5            THE COURT:  And this one has the listing of the cities.

6            THE WITNESS:  That's correct.

7  A.   And that shirt was seized from people with IDs from Pasadena,

8  California; Los Angeles, California; Gardena, California; Apple

9  Valley, California; Santa Monica, California; and Poughkeepsie,

10 New York.

11      This particular shirt is a different design.  This was seized

12 at WrestleMania from someone from Davenport, Florida.  And it's just

13 a logo in the front and more ink on the back.

14 Q.   And when you received those shirts -- the Court is a little far

15 away -- was there a smell to a lot of those shirts?

16 A.   I was just going to show you.  If I might hand it to you.

17 There's a -- (handing to the Court) -- a distinct chemical odor.

18           THE COURT:  Have you had that analyzed as to how it was

19 applied?

20           THE WITNESS:  We haven't had the opportunity, no.

21           THE COURT:  But it's very strong.

22           THE WITNESS:  Yes.  And that's been outside of the bag for

23 a few days.

24           THE COURT:  This is the one that is different from the

25 others, and on the back has the date of April 1, 2012.

```
 1          THE WITNESS:  Right.
 2  A.   And then this is another shirt that was seized from a woman who
 3  claims to live in Florida.
 4          THE COURT:  So, you actually had women peddling these as
 5  well.
 6          THE WITNESS:  This is the first time that we've seen a
 7  woman, yes.
 8  A.   This one also has a distinct pleasant odor.
 9      And this is --
10          MR. MORTON:  Just for the record, the "pleasant" was a
11  sarcasm.
12  A.   Absolutely.
13      This is The Rock.  I don't know if you know him.  He's one of
14  our biggest talent right now.  He's also in mainstream movies.  He
15  was one of the headline events at WrestleMania.  And so, this was
16  one of the shirts that was being sold with his -- our intellectual
17  property with his name on it.
18          THE WITNESS:  If you want to smell this, it also has an
19  unpleasant odor.  (Handing to the Court.)
20          THE COURT:  I don't even have to have it close to my nose.
21      This one, instead of a T-shirt, is sort of like --
22          THE WITNESS:  A football jersey.
23          THE COURT:  -- a football jersey.
24          THE WITNESS:  Right.
25      BY MR. MORTON:
```

1  Q.    And did The Rock play football?

2  A.    Yes, he did.

3  Q.    And where did he play football?

4  A.    I believe it was in Canada.  In fact, at last night's Raw

5  event, he made a joke about how he was kicked off the Canadian

6  football team.

7        THE COURT:  So, she was the only dispenser of those shirts,

8  that you were able to seize five from her?

9        THE WITNESS:  Five of one color, 13 of the other color.

10 It's the same shirt, just a different color.  An even worse odor.

11       THE COURT:  I'll take your word for it.

12       THE WITNESS:  The plastic is hard and does not even bend

13 easily.  I don't know what it would do to a washing machine or

14 somebody who wore it.

15       THE COURT:  So, the five were with the red, and the 13 were

16 sort of the cobalt blue.

17       THE WITNESS:  Correct.

18 A.    This is another shirt from an individual claiming to be from

19 Pasadena, California.

20       Another child size shirt.  Same logo as you saw before, not a

21 logo we were using on our shirts.  Nothing on the back this time.

22       What's interesting about this shirt is in the neck label,

23 they've actually gone so far as to copy our authentic neck labels,

24 but what they didn't realize is the Zappar, Z-A-P-P-A-R, that

25 appears underneath, the legitimate shirt that has this neck label is

1  what's called a "virtual reality shirt," which means when you take

2  your iPhone, or any kind of cell phone, if you download the app for

3  the shirt from the Zappar company, aim it at the shirt, you can

4  watch video on your iPhone that is based on this shirt.  It's

5  relatively new, and it's something that's very creative and

6  otherwise a great shirt, but they didn't realize that that's what

7  that shirt was for.  And all they did was merely copy the neck

8  label.  And this is not one of those shirts.  It does not activate

9  the application.  And, again, aimed at a child.

10       This shirt, again, was seized from the same individual that

11  made that shirt, claiming to be from Pasadena.  Another child's

12  version of the shirt.  They Have the same cut-off dates.

13            THE COURT:  On the back?

14            THE WITNESS:  I don't know if you want me to show you all

15  the shirts.  I'm happy to do so.

16            THE COURT:  The rest are the same as the first ones?  Are

17  there any other different ones?

18            THE WITNESS:  This one is different.

19            **BY MR. MORTON:**

20  Q.   And to be clear, were you seeing similar shirts from multiple

21  of the folks who we seized shirts from?

22  A.   Absolutely, yeah.  From -- All the shirts that we seized at

23  Axxess, for example, they were all the same.  They were all that

24  original shirt.  And all of them were from different areas, and they

25  weren't standing together or working together.  We don't know if

1  they know each other or how they know each other.  I'm sure they do.

2  But they were all selling the exact same shirt.  Again, images that

3  we don't have up on our website are not out there, and no reason to

4  otherwise use those images.

5  Q.   At least some of those shirts you've seen at other venues?

6  A.   Particularly at Fresno, California, before WrestleMania, that

7  same shirt was there.

8         THE COURT:  And the other ones, the jerseys and the

9  different child shirt that just has "WrestleMania 2012" with nothing

10  on the back, did you see that image at any other time over the

11  weekend?

12         THE WITNESS:  We did see that one from other -- I think it

13  was one other seller.  Nothing on the back.  It was just a few that

14  he had of those particular ones, because the larger sellers were the

15  other original shirt.

16         THE COURT:  And the two jerseys with -- and the foul

17  smelling ones, did you see any similar -- or any other sellers,

18  other than the two that you spotted, the lady and -- Was the lady

19  the only one selling the jerseys?

20         THE WITNESS:  That's correct, yes.

21         THE COURT:  Did you see anyone else selling jerseys or --

22         THE WITNESS:  No, I did not.

23  A.   Here's another style of shirt that was being sold.  This was

24  one of those drop and runs.  It's just WrestleMania branded.  That's

25  the front and this is the back.

1       And this is the same shirt, but a different color.

2       And if you notice, the image on the back is actually --

3           THE COURT:  How are they different in color?

4           THE WITNESS:  This is black, that one is blue.  Not that I

5   want to put these on me.

6           THE COURT:  One is Navy blue and the other is black.

7           THE WITNESS:  Yes.

8           THE COURT:  Okay.

9           **BY MR. MORTON:**

10  Q.    As you're going through the shirts that were seized, where were

11  a lot of them aimed?  Were a lot of them aimed at children, adults?

12  A.    Most of them were children.  And according to the undercover

13  officers who were working for us, they said that's very common,

14  because the kids will see them.  They'll be the ones to bug their

15  parents to get them, and those are the ones that they hope will be

16  bought.  And they are.

17      And each shirt that I'm showing you, by the way, is from a

18  different person.  It's not all the same people.  But, again, same

19  design.

20      And these were actually from earlier, when we came in before.

21      So, those are samples of the different designs that we found

22  throughout the weekend.

23  Q.    And if you go to the very last page of your PowerPoint -- the

24  other pages were of the shirts -- you have something called "Points

25  to Remember."  I just want to ask you about those.

1       Tell me about the first point.

2  A.   As we discussed, most of these shirts bore the same design, the

3  same image, and these are not images that are currently available,

4  these are not images that would otherwise be obviously used by fans

5  who are following story line.  So, there has to be more than a

6  coincidence that people from different locations are selling the

7  exact shirt, front and back.  And we're finding them not in just one

8  location, but in other locations at our live events.

9       And that's the key here.  We need to be able to seize these

10 shirts at our live events.  They're specific events, at specific

11 locations.  And this is designated to seize individual --

12 counterfeit merchandise from those individuals selling at our live

13 events at specific locations.  It's a very specific remedy that we

14 need, because these are the people that are following us around.

15 We're not seeking them out.  They are coming to us and following us.

16 Q.   And when you say "following" --

17      MR. MORTON:  If I could approach the witness with an

18 exhibit, Your Honor?

19      THE COURT:  Yes.

20      (Document handed to witness.)

21 Q.   What is the document I just handed you?

22 A.   This document is a schedule of our live events, starting from

23 March, 2012, and up to and including March, 2013.  We have booked

24 these venues for our live events between now and then, and with only

25 minor exceptions would these change.

1      So, we have scheduled live events at all of these locations.

2  So, we have specific knowledge of where we will be, as do our fans,

3  and as do the bootleggers, because it's on our website, the

4  information is publicized, because we want the fans to go and buy

5  the tickets.  But this is common knowledge, it's out there, and

6  that's how the bootleggers know how to follow us, and they know

7  where we'll be.

8  Q.   Starting next week, can you just kind of take the Court

9  through -- I know some are bold and some are not -- just talk us

10 through what is -- What are these events?

11 A.   Well, for example, the end of March, as you know, was the

12 WrestleMania events that we were here for.

13     Last night, on April 2nd, was our Raw TV, which is one of our

14 regular weekly scheduled programs, but it's live, taped live in

15 front of a live audience and aired live.

16     Tuesday is our SmackDown TV, which is another show.  It is

17 taped in front of a live audience.  It airs on Wednesday.  But,

18 again, it has a live audience.  So, it's people coming to the venue.

19     All of these events listed in these calendars are a venue, a

20 live audience, fans coming to the events.  And you can go on our

21 website, and you can buy tickets to these events.  They are

22 obviously publicized, because we want people to buy tickets.  And,

23 again, as I said, that's how the fans know where to go, and that's

24 also how the bootleggers know where to go.  Specific locations,

25 specific dates, specific times.

1  Q.   In your past experience, have bootleggers shown up to these

2  events?

3  A.   Absolutely.  I am shipped counterfeit merchandise on a daily

4  basis, because we've gotten orders in the past, and that's the only

5  way we can get this counterfeit merchandise off the streets.  And

6  when our security personnel, off-duty officers seize it, they send

7  it back to us.  And each event, I get a box sent to me of the

8  merchandise that was seized then.  And if we are powerless to seize

9  it, we can't stop it from being sold to kids.

10      And we were discussing earlier the cost prohibitive nature of

11 these, and that's one of the points that we're going to make.  But

12 with all due deference to our litigation counsel, it costs WWE about

13 $80,000 a year to get these orders.  And we certainly do not seize

14 $80,000 worth of counterfeit product.  So, that's not our main goal

15 because it's going to offset financial money for us.  It's not going

16 to make us money.  If you do the analysis from a fiscal perspective,

17 it's really not worth it.

18      So, there's another goal for us.  The goal is to get this

19 product off the streets.  We don't know what it's made of.  We don't

20 know what the ink has in it.  We don't know the chemicals that are

21 causing the odor to last three days later is still in the air that

22 you can smell it a foot away.  We don't know what these are made of.

23 But we know they're not safe.  We know they're sub quality.  I don't

24 know what they'll do to a washing machine, how it will affect other

25 clothes.  I don't know if it will cause skin conditions.  They're

1  geared towards children.  And if we can't take it off the street,

2  we're powerless.

3      And it's not because of the money that we want to take it off

4  the street.  We're still selling our legitimate product, although

5  this does harm our reputation as a company if someone doesn't

6  realize that it's not genuine product.  They might think they're

7  getting subpar quality from WWE, and the next time they go to an

8  event, they won't buy it.  It does hurt our reputation.  But that's

9  one fact.  The other fact is the public safety concern.  We're not

10 seizing $80,000 worth of product, but we do it every year for that

11 reason.  And if we don't get an order, the bootleggers win.  We

12 can't seize it.

13 Q.  And it's your experience -- Is it your belief that the

14 bootleggers travel with the show?

15 A.  Absolutely travel with the show.  They know where we'll be.

16 They sometimes know our enforcement personnel.

17         THE COURT:  How do you know that?

18         THE WITNESS:  One of our off-duty officers told me that

19 when he approached one of them, they knew his name.  They had heard

20 of him, because they know that he works for enforcement.  And they

21 are not worried.

22         THE COURT:  Who is that individual?  Who is the enforcement

23 officer?

24         THE WITNESS:  John Caruthers.  He is the one who comes to

25 most of our live events, trains the local off-duty officers on the

procedure on how to serve under the order.  And he goes to most of

our live events.  And he's very well known.  He's been working for

us for many years.  That's who we used in Miami as well.

Q.    And in your experience with WWE, has any of these bootleggers

ever shown up in court or otherwise protested a seizure order?

A.    Not a single time.

      We would hope that they would, because then we would have the

opportunity to question them and to really get at the source.  They

never have, because they don't want to submit to that, because they

don't want to give us that information.  Their business will be

gone, and they won't be able to then still sell at our events.  We

would hope that they would.

      And as our esteemed colleagues said, we would, if at all

possible, move it to their location, wherever they actually do live,

if that ever came up.  If we were able to do that, we would do that,

because we do want to find out the source of these products.

      They're not coming from overseas.  We file our trademark

registrations with Customs in all countries, including the United

States.  We get notifications of counterfeit product coming in.  We

act quickly with Customs.  It's seized.  We investigate by tracking

number what manufacturer it's coming from, what licensee, and we

determine quickly, within a day or two, whether it's product that's

legitimate or counterfeit.  So, we know what's coming in the borders

when seized by Customs.  This is homegrown.  This is something we

can't trace.  We can't get back to the source.  So, it's kind of a

1  whack-a-mole method --

2          THE COURT:  It's kind of a what kind of method?

3          THE WITNESS:  Whack-a-mole -- sorry.  It's a carnival game

4  where the little heads pop up, and you have to hit them with a

5  mallet.  And the object is to not let any one pop up.

6  A.   So, this is very much like that, in the sense that because they

7  don't show up, we can't get to the source.  So, the only remedy that

8  is available to us is to hit them as they show up.  And hitting them

9  doesn't mean scare them away with police presence, because then

10 they'll just go underground where we can't find them.  It means

11 seizing the merchandise, A, in the hopes that one day one person

12 will show up, and we can get to the source, or, B, that they stop

13 selling because they realize they're not going to make money,

14 because we're going to seize it.

15         THE COURT:  And how long have you been with WrestleMania

16 now?

17         THE WITNESS:  With World Wrestling Entertainment, I've been

18 with them almost 11 years.

19         THE COURT:  Okay.  And how long as the corporate vice

20 president for intellectual properties?

21         THE WITNESS:  About three years, but I have always been a

22 part of the intellectual property department.  I'm the person who's

23 in charge of all of the trademarks worldwide, as well as all the

24 license agreements, as well as all the approvals for our venue and

25 licensed product.  So, I know the designs we're making; I search

1  them for availability and clear them and file for them.  I'm the one

2  who has been in charge for 11 years of the intellectual property

3  portfolio.

4           THE COURT:  Okay.

5           You all are wearing me down.

6           THE WITNESS:  I hope we're just convincing you of the

7  danger that's out there and the only remedy that we have.

8           THE COURT:  I see the problem.  The issue -- and I'm going

9  to give this back to you, Mr. Morton -- is how do I fashion an order

10 that is consistent with the statute.

11          Do you have any other questions of this witness?

12          MR. MORTON:  No, no, Your Honor.  Thank you very much.

13          THE COURT:  Okay.

14          Just thinking through the logistics here, the parties have

15 established a need for an injunction, and that it needs to be

16 nationwide, and given the unique set of circumstances here, the fact

17 that there is a published route, that it's published on a website,

18 so it's available to everyone, that there appears to be a cadre of

19 camp followers, including the same person at the past that have been

20 served with injunctions, but this has not stopped them, and that

21 they are primarily selling merchandise that is aimed towards

22 children, and based on the evidence presented here, product that is

23 obviously of great concern as to the quality and the safety of the

24 dyes, I can see how you need it to be nationwide.

25          The question that I have is right now -- the two initial

1  questions are:  How do I draft the order so that it is consistent

2  with the provisions of the act, which I can't ignore?  I mean that's

3  not an option.  And then the second thing is:  How do I ensure that

4  if someone does show up, how does that -- or seek to contest, how

5  does that person come back to me to do that, because this is the

6  jurisdiction in which it was issued?

7          MR. MORTON:  Well, as to your last --

8          THE COURT:  And I'm going to give this back to you and

9  suggest that you think about it and let me know by this afternoon

10 how -- and come up with a proposed draft order, because it needs --

11 Let's face it, what you need is something that is easy to read, easy

12 to enforce, because if you get -- somebody raises an issue in

13 another jurisdiction, you want that new judge to have access to this

14 file and all of the evidence that you have presented here in this

15 case.  So, to a certain extent, I'd like for you to put together

16 affidavits that attach these proofs of service and venue enforcement

17 reports so that it is filed in this court record.

18         I'd also like for you to attach, either as an affidavit or

19 just simply a notice of filing, of what is in the PowerPoint,

20 because here, particularly with a trademark or Lanham Act

21 infringement, a picture is worth a thousand words, and the devil is

22 in the details.

23         But I'm persuaded that you do need to have a nationwide

24 seizure order.  But if I'm going to be the first one that really

25 does one -- I know that you've given me one before, but I looked at

1 the one that was out of Boston that Judge Gertner signed, and it was

2 obviously a form order that she just sort of signed.  And I don't

3 want this to be a law treatise.  But let's face it, you all are

4 interested in having something that stands up.

5          MR. MORTON:  We'll do that, Your Honor.

6          THE COURT:  Is there anything else that we need?

7          MR. MORTON:  No, Your Honor.  Thank you very much.

8          THE COURT:  I thank you very much for the education.  Let

9 me give you back all of these items.

10          And if you can, just give me -- I don't know how you're

11 going to do this so quickly -- It's the Kentucky case, isn't it,

12 that you're relying on?  It has the initials, the 233 F.Supp.2d 849.

13 What's the name of the case?

14          MR. MORTON:  SKS Merchandise.

15          THE COURT:  That's out of Kentucky, correct?

16          MR. MORTON:  Correct.

17          THE COURT:  I can remember all of the other details except

18 for the names.

19          I will be happy to enter the preliminary injunction,

20 because I think that you've met all of the criteria for showing a

21 strong likelihood of success on the merits, and that if I don't

22 enter the injunction, the safety of the public is at jeopardy, to

23 say nothing of what other recourse do you have to protect your

24 trademark.  Okay?

25          THE WITNESS:  Thank you, Your Honor.

1          MR. MORTON:  Thank you, Your Honor.

2          THE COURT:  How are we going to do this so that it's short

3   and easy?  You need to think through the mechanics so we can deal

4   with the provisions under subparagraph 5 of 1116(d).

5          MR. MORTON:  Okay, Your Honor.  You want it this afternoon,

6   you said?

7          THE COURT:  If you can get it.  Or -- When is your next

8   event?  It's tomorrow.

9          THE WITNESS:  Tonight.  It's tonight in Orlando.

10          THE COURT:  Okay.

11          MR. MORTON:  We'll get it to you as soon as we can, Your

12   Honor.

13          THE COURT:  Okay.  I'd rather it be good.

14          MR. MORTON:  I understand that.

15          If you want us to add in the facts we talked about today,

16   we'll -- We started doing that.  We'll -- As you know, it's a

17   moving -- We're trying to get as much as we can --

18          THE COURT:  I recognize that the fire is out there.  But we

19   have to cross the T's and dot the I's.

20          MR. MORTON:  I understand.  And just as a logistical

21   practical, are we now back to e-filing, or are we still --

22          THE COURT:  Now that I've unsealed, you can e-file.  You

23   don't have to submit anything.

24          MR. MORTON:  Okay.

25          THE WITNESS:  The current order is in place, I think, until

1  midnight tonight, correct?

2          MR. MORTON:  Correct.

3          THE WITNESS:  I think we would be covered still for

4  tonight.  I don't know if that --

5          THE COURT:  But the current order did not cover Orlando.

6          MR. MORTON:  Right.

7          THE WITNESS:  I'm sorry.  Yes.

8          THE COURT:  The current order was just here for Miami.

9          THE WITNESS:  That's correct, Your Honor.  Thank you.

10         THE COURT:  You have persuaded me, though, as to the need.

11 And you've really turned me around with your evidence.

12         MR. MORTON:  Thank you, Your Honor.

13         THE COURT:  Okay.

14         THE WITNESS:  Thank you.

15         THE COURT:  You make a good witness, too.

16         THE WITNESS:  Thank you.

17         THE COURT:  Do you need your Vuitton vs. White case back?

18 Let me give this back to you so you have your copy.

19         Louis Vuitton is very, very proactive in protecting its

20 mark.

21         MR. MORTON:  Yes.

22         THE WITNESS:  I'm actually good friends with their

23 enforcement counsel.  So, I agree with you, they are.

24

25

1          THE COURT:  But I can imagine --

2          We're off the record, Mr. Ehrlich.  We're finished.

3          (Off-the-record discussion.)

4

5                          **CERTIFICATION**

6

7    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

8    OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9    June 4, 2012                    S/DAVID S. EHRLICH
                                     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2
# to Declaration of Lauren Dienes-Middlen, Esq.

# World Wrestling Entertainment

# WrestleMania Events
# 2012
# Enforcement Results

# <u>WRESTLEMANIA 2012 – 78,363 attendees</u>
## (Sun Life Stadium's largest attended event in history)



# <u>There was an extremely large police presence at all events</u>:

 

 

# And on the roads leading to the events as well:






## **Counterfeiters were found selling bootleg merchandise**

<u>WrestleMania Axxess venue</u>                    <u>Fan Parking Lot</u>



<u>Bootleggers were selling here</u>



**I was able to take a a photo of one counterfeiter selling shirts on the path leading from one fan parking lot to WrestleMania at Sun Life Stadium…**



**Counterfeit shirts were also being sold in the parking lots and areas outside the stadium…**

# Example of counterfeit shirts found*



*Front of shirt*



*Back of shirt*

**\* This design, which is <u>not</u> WrestleMania-branded, shows the intent of the counterfeiters to sell counterfeit shirts at WWE around at all of our events…**

 

(this is the shirt from the previous slide)…

**This identical shirt design (front & back) was being sold this weekend by counterfeiters from the following locations:**

- Pasadena, *California*
- Los Angeles, *California*
- Gardena, *California*
- Apple Valley, *California*
- Santa Monica, *California*
- Poughkeepsie, *New York*

We've also seen this identical shirt sold at previous WWE events by other counterfeiters residing in <u>other locations</u>.  The design contains the image of Brock Lesnar, who has not been with WWE for many years.

# <u>Other shirt designs seized this weekend</u>:



Front



Back

*Seized from individual from Santa Monica, California*

## <u>Other shirt designs seized this weekend</u>:





Front                                          Back

*Seized from individual from Davenport, Florida*

# <u>Other shirt designs seized this weekend:</u>



#1 Front



#1 Back

*Seized from individual from Pembroke Pines, Florida*



#2 Front



#2 Back

# Other shirt designs seized this weekend:



Front



Back

*Seized from individual from Pasadena, California (counterfeiter copied our specialized neck label)*

# <u>Other shirt designs seized this weekend</u>:



Front



Back

*Seized from individual – "drop & run" – no ID*

# TOTAL NUMBER OF COUNTERFEIT SEIZED DURING WRESTLEMANIA EVENTS (not including Raw on 4/2/12)

## 265 counterfeit shirts



## <u>Points to Remember</u>:

1.  Most of the shirts seized were the <u>identical</u> design, even though the counterfeiters came from different locations/states

2.  The most common design found contained an image of a wrestler who has not been with WWE for many years – not a current image.

3.  **MOST OF THE SHIRTS WERE CHILDREN SIZED – to be sold to, and worn by, children.  Therefore, the greatest risk was to our nation's children who travel from all over to come to our events nationwide.**

# EXHIBIT 3
# to Declaration of Lauren
# Dienes-Middlen, Esq.

# <u>BEFORE WRESTLEMANIA EVENTS:</u>

In the middle of March 2013, we encountered the following shirts during our live events in Pittsburgh, PA and Cincinnati, OH:



(Front of shirt)



(Back of shirt)

**This shirt was also being sold in New Jersey during the WrestleMania Events.**

## <u>BEFORE WRESTLEMANIA EVENTS:</u>

On Sunday, March 31, 2013, we encountered the following shirts during our live event in White Plains, NY:



(Front of shirt)



(Back of shirt)

# <u>DURING WRESTLEMANIA EVENTS:</u>

<u>#1: Seized from Herbert Reid, from Schenectady, NY (he was served)</u>:



(Front of shirt)



(Back of shirt)

**60 Shirts Seized**

# <u>DURING WRESTLEMANIA EVENTS:</u>

<u>#3: Seized from John Doe (he was served):</u>



(Front of shirt)



(Back of shirt)

**5 Shirts Seized**

# <u>DURING WRESTLEMANIA EVENTS:</u>

<u>#5: Seized from Byron Douglas, from Brooklyn, NY (he was served)</u>:



(Front of shirt)



(Back of shirt)

**3 Shirts Seized**

# <u>DURING WRESTLEMANIA EVENTS:</u>

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

**Approx. 190 Shirts Seized**

# <u>DURING WRESTLEMANIA EVENTS:</u>

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

<span style="color:red">**Approx. 30 Shirts Seized**</span>

# <u>DURING WRESTLEMANIA EVENTS:</u>

<u>#2: Seized from John Doe (he was served):</u>



(Front of shirt)



(Back of shirt)

**4 Shirts Seized**

# DURING WRESTLEMANIA EVENTS:

#4: Seized from John Doe (he was served):



(Front of shirt)



(Back of shirt)

**6 Shirts Seized**

# <u>DURING WRESTLEMANIA EVENTS (at Raw on 4/8/13):</u>

<u>#7: Seized from Christopher Huff (he was served):</u>



(Front of shirt)



(Back of shirt)

## 20 Shirts Seized

# <u>DURING WRESTLEMANIA EVENTS (at Raw on 4/8/13)</u>:

<u>#8: Seized from Scott Dreger, from Springfield, PA (he was served)</u>:



(Front of shirt)



(Back of shirt)

**21 Shirts Seized**

# <u>DURING WRESTLEMANIA EVENTS:</u>

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

## Approx. 40 Shirts Seized

# <u>DURING WRESTLEMANIA EVENTS:</u>

## Seized from many different John Does (would not accept service):



(Front of shirt)



(Back of shirt)

<span style="color:red">**Approx. 15 Shirts Seized**</span>

# <u>DURING WRESTLEMANIA EVENTS</u>:

## Seized from many different John Does (would not accept service):





(Back of shirt)

(Front of shirt)

**Approx. 50 Shirts Seized**

# <u>DURING WRESTLEMANIA EVENTS</u>:

<u>#6: Seized from Victor William Pritchard, from Orange, CA (he was served)</u>:

 



**28 Poster Boards Seized**

# <u>DURING WRESTLEMANIA EVENTS</u>:

<u>#9</u>: Seized from William S. Brown, from Middletown, CT (he was served):







<span style="color:red">**103 DVD Sets Seized
(2,042 Discs Seized)**</span>

# <u>DURING WRESTLEMANIA EVENTS</u>:

<u>#10</u>: Seized from Kenneth Asal, from East Berlin, CT (he was served):





**11 Action Figures Seized**



# <u>WRESTLEMANIA EVENTS SEIZURE TOTALS</u>

| <u>Description</u> | <u># Seized</u> | <u>Value</u> |
|---|---|---|
| Shirts | 440 ($20 each) | $8,800.00 |
| Poster Boards | 28 ($25 each) | $700.00 |
| Action Figures | 11 ($30 each) | $350.00 |
| DVDs | 103 DVD Sets = 2,042 DVDs | Value of $52,000.00 |

**2,491 units**

# EXHIBIT 4
# to Declaration of Lauren Dienes-Middlen, Esq.

<u>VENUE ENFORCEMENT REPORT</u>

Date of Event: _____ 3-28-15 _____

Event Venue: _____ SAP CENTER _____

Name of Defendant Served: Benjamin Adham Pechetti

Address of Defendant Served:

_____ 1284 ODDSTAD DRIVE _____

_____ Redwood City, CA 94063 _____

Time Defendant Served: _____ 1520 hrs _____

Type of Merchandise Seized: Cardboard Photo's

Quantity of Merchandise Seized: _____ 18 _____

Approx. Height of Defendant: _____ 6'1 _____

Approx. Weight of Defendant: _____ 220 _____

Ethnicity of Defendant: _____ W/m _____

Law enforcement involvement: Homeland Security Investigation (HSI)

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  15-cv-01263-VC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* Benjamin Adham Pechutti

was received by me on *(date)* 3-28-15

☒ I personally served the summons on the individual at *(place)* SAP CENTER on

autumn St.                             on *(date)* 3-28-15          ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.

Date:  3-28-15

_____
Server's signature

Todd Schoenberger
Printed name and title

200 S. First. St., Suite 170
San Jose, CA 95113
Server's address

Additional information regarding attempted service, etc:

## VENUE ENFORCEMENT REPORT

Date of Event: _3/21/2015_

Event Venue: _Levi's Stadium_

Name of Defendant Served: _Ibraham Nimer Shiheiber_

Address of Defendant Served:

_847 Skyline_

_Daly City, CA 94132_

Time Defendant Served: _13:40_

Type of Merchandise Seized: _Flags / Towels_

Quantity of Merchandise Seized: _62_

Approx. Height of Defendant: _5'7"_

Approx. Weight of Defendant: _160 lbs._

Ethnicity of Defendant: _W_

Law enforcement involvement: _HSI Seizure_

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* Ibrahim Nimer Shiheiber

was received by me on *(date)* 3/28/2015

☒ I personally served the summons on the individual at *(place)* Levis Stadium,
Green Lot 1 ( 4949 Marie De Bartolo Way, Santa Clara, CA 95050 ) on *(date)* 3/28/2015 ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 3/28/15

Server's signature

Todd Schoenberger
Printed name and title

280 S. First St.
Suite 190
San Jose, CA 95113
Server's address

Additional information regarding attempted service, etc:

## VENUE ENFORCEMENT REPORT

Date of Event: 3-28-15

Event Venue: SAP CENTER

Name of Defendant Served: Dominic Angel Rodriguez

Address of Defendant Served:

3015 E. Bayshore Rd., Spc. 202

Redwood City, CA 94063

Time Defendant Served: 3:20 pm

Type of Merchandise Seized: "Fat Heads"

Quantity of Merchandise Seized: 2

Approx. Height of Defendant: 5'7"

Approx. Weight of Defendant: 176 lbs

Ethnicity of Defendant: W

Law enforcement involvement: HSI Seizure

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* Dominic Angel Rodriguez

was received by me on *(date)* 3/28/15 .

☑ I personally served the summons on the individual at *(place)* SAP Center on Autumn St.

on *(date)* 3/28/15 ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 3/28/15

_____
*Server's signature*

Todd Schoenberger
*Printed name and title*

280 S. First St., Ste 120
San Jose, CA 95113
*Server's address*

Additional information regarding attempted service, etc:

## VENUE ENFORCEMENT REPORT

Date of Event: _3/28/15_

Event Venue: _SFP Center_

Name of Defendant Served: _Vu Truong Tran_

Address of Defendant Served:

_80 Glenn Way APT B_

_San Carlos, CA 94070_

Time Defendant Served: _3:20 pm_

Type of Merchandise Seized: _"Fat Heads"_

Quantity of Merchandise Seized: _2 ea_

Approx. Height of Defendant: _5'5"_

Approx. Weight of Defendant: _135 lbs_

Ethnicity of Defendant: _A_

Law enforcement involvement: _HSI Seizure_

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for (name of individual and title, if any) Vu Truong Tran

was received by me on (date) 3/28/15 .

☒ I personally served the summons on the individual at (place) SAP Center on Autumn

on (date) 3/28/15 ; or

☐ I left the summons at the individual's residence or usual place of abode with (name)

_____ , a person of suitable age and discretion who resides there,

on (date) _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on (name of individual) _____ , who is

designated by law to accept service of process on behalf of (name of organization)

_____ on (date) _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other (specify):

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 3/28/15

_____
Server's signature

Todd Schoenburger
Printed name and title

280 S. First St., Ste 190
San Jose, CA 95113
Server's address

Additional information regarding attempted service, etc:

# EXHIBIT 5
## to Declaration of Lauren Dienes-Middlen, Esq.

**In February 2015, WWE was contacted by the Department of Homeland Security, San Jose office regarding a store in the a mall in San Jose, CA. The owner of this store was selling a volume of merchandise that DHS believed to be counterfeit, including NFL, MLB, NBA and WWE product. The owner of this store was also working with a third party wrestling promotion that follows WWE shows to sell product nearby.  WWE worked with DHS to identify which items were indeed WWE counterfeit product, including the use of our intellectual property on their actual business cards:**



**On Wednesday, March 25th, DHS raided Milo's Collectibles in San Jose, CA (this action was not under WWE's TRO, but rather pursuant to a search warrant obtained by DHS - lots of WWE intellectual property present):**





**DHS seized more than 60 counterfeit WWE shirts containing the following six designs (selling for $25 each / 2 for $40):**

#1



#2



#3

#4





#5

#6





**DHS also seized more than 15 counterfeit WWE plaques (worth approx. $150 each):**



**Additional counterfeit WWE plaques seized:**





# Additional counterfeit WWE plaques seized:

 

# Counterfeit WWE nameplates seized:



**The owner of the store admitted to making unauthorized copies of WWE copyrighted photos:**





# DHS ended up seizing approximately <u>$3800</u> worth of counterfeit WWE product:





DEPARTMENT OF HOMELAND SECURITY

No. 60358 ~~>~~
04

**CUSTODY RECEIPT for**
**SEIZED PROPERTY and EVIDENCE**

Handbook 5200-09

| 1. FPF No. 2 0 1 5 2 8 3 4 0 0 0 0 2 7 0 1 | 2. Incident No. 2 0 1 5 6 2 0 0 5 8 1 1 0 0 1 | | |
|---|---|---|---|
| 3. Investigative Case No. 3 N O O N H 1 4 3 N O 0 0 3 | 4. Enforce No. ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐ | | |
| 5. Prior Detention? Yes ☐ No ☐ If yes, DHS 6051D No. _____ | 6. Date Seized (mm/dd/yyyy) 03/25/2015 | 7. Time Seized (Use 24 Hrs) | 8. FDIN/Misc. |
| 9. Seized From: Name: MILO LECA | 10. Entry No. | | 11. Seal or Other ID Nos. |
| Address: 2200 EASTRIDGE LOOP #1408 SAN JOSE CA 95122 Telephone No. 408 532 0706 Ext: | 12. Remarks: | | |
| 13. Send Correspondence to: | | | |

| 14. PROPERTY ( By Line Item) Attach DHS Form 58 if conveyance | | | | | |
|---|---|---|---|---|---|
| a. Line Item No. | b. Description | c. Packages Number / Type | d. Measurements Qty. / UM | | e. Est. Dom. Value |
| 1 | Counterfeit WWE T-Shirts | | 37 | ea | $ 1110 |
| 2 | Counterfeit WWE Plaques | | 9 | | $ 1350 |
| 3 | Counterfeit WWE SHADOW BOXES | | 3 | | $ 600 |
| 4 | Counterfeit WWE Nameplates | | 11 | | $ 55 |
| 5 | Business Cards Bearing unauthorized WWE Trademark | | 11 | | $ 1 |
| 6 | Counterfeit WWE Mini Plaques | | 8 | | $ 120 |

| 15. Seizing Officer T. Stebbins | | x | | | 3 /25/15 |
|---|---|---|---|---|---|
| Print Name | | | Signature | | Date |

| 16. ACCEPTANCE / CHAIN OF CUSTODY | | | | |
|---|---|---|---|---|
| a. Line Item No. | b. Description | c. Print Name/Title/Organization | d. Signature | e. Date |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DHS Form 6051A Continuation Sheet Attached? Yes ☐ No ☐
DHS retains original
Previous editions are obsolete

DHS Form 6051S (08/09)

---

DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

6035804

**CUSTODY RECEIPT FOR RETAINED OR SEIZED PROPERTY**
CONTINUATION SHEET

| SN08NH145N0003 | | CIS Handbook No. HB 5200-09 | | 2015 2834 0000 27 01 | | |
|---|---|---|---|---|---|---|
| 1. PORT 2834 | 2. SEIZURE NO. | 3. GENERAL ORDER NO. | | 4. OTHER CONTROL NO. 6035804 | 5. DATE RET./SEIZED | |

| 20. PROPERTY (By Line Item) Attach CF 58 if conveyance. | | | | | | |
|---|---|---|---|---|---|---|
| a. LINE ITEM NO. | b. DESCRIPTION | c. CONDITION | d. TYPE OF CONTAINER | e. UM | f. QTY | g. APPRAISED DOMESTIC VALUE | h. HELD BY PORT |
| 7 | Wrestlecon Flyers Bearing unauthorized WWE Trademark | | | ea | 42 | 1 | |
| 8 | Counterfeit NFL Jerseys | | | | 30 | 5,100 | |
| 9 | Counterfeit NFL Ponchos | | | | 8 | 480 | |
| 10 | Counterfeit NBA Jerseys | | | | 18 | 1,800 | |
| 11 | Counterfeit MLB Jerseys | | | | 20 | 3,400 | |
| 12 | Counterfeit NHL Jerseys | | | | 6 | 1,200 | |
| 13 | Counterfeit NHL Sweatshirts | | | | 3 | 150 | |
| 14 | Counterfeit MLB Patches | | | | 33 | 495 | |
| 15 | Counterfeit NFL Patches | | | | 55 | 825 | |
| 16 | Counterfeit NHL Patches | | | | 2 | 30 | |
| 17 | Counterfeit NBA Patches | | | | 1 | 15 | |
| 18 | Counterfeit NFL Hats | | | | 12 | 420 | |
| 19 | Counterfeit MLB Hat | | | | 1 | 35 | |
| 20 | Counterfeit MLB Ring | | | | 1 | 40 | |
| 21 | Counterfeit NFL Rings | | | | 7 | 280 | |
| 22 | Counterfeit NFL Beanies | | | | 20 | 500 | |
| 23 | Counterfeit NBA Beanies | | | | 2 | 50 | |
| 24 | Counterfeit MLB Beanies | | | | 4 | 100 | |
| 25 | Counterfeit NHL Beanies | | | | 10 | 250 | |
| 26 | Wrestlecon Poster Bearing unauthorized WWE Trademark | | | | 1 | 1 | |
| 27 | Counterfeit NFL Jerseys | | | | 22 | 3,740 | |
| 28 | Counterfeit WWE T-shirts | | | | 19 | 570 | |
| 29 | Counterfeit MLB Jerseys | | | | 9 | 1,530 | |

Customs Form 6051A (051396)

**On Saturday, March, 28ᵗʰ, while fans lined up to enter the WWE Hall of Fame event, DHS discovered three Bootleggers selling counterfeit WWE cardboard signs to fans as they waited on line:**

**DHS seized this counterfeit product and served the three defendants…**





**VENUE ENFORCEMENT REPORT**

Date of Event: _3·28·15_

Event Venue: _SAP CENTER_

Name of Defendant Served: _Benjamin Adham Pechetti_

Address of Defendant Served:

_1284 ODDSTAD DRIVE_

_Redwood City, CA 94063_

Time Defendant Served: _1520 hrs_

Type of Merchandise Seized: _Cardboard Photo's_

Quantity of Merchandise Seized: _18_

Approx. Height of Defendant: _6'1_

Approx. Weight of Defendant: _220_

Ethnicity of Defendant: _W/M_

Law enforcement involvement: _Homeland Security Investigation (HSI)_

---

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _Benjamin Adham Pechetti_
was received by me on *(date)* _3·22·15_ .

☒ I personally served the summons on the individual at *(place)* _SAP CENTER_ on
_autumn St._ on *(date)* _3·28·15_ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _3·28·15_

_____
Server's signature

_Todd Schneeberger_
Printed name and title

_200 S. First St., Ste 170_
_San Jose, CA 95113_
Server's address

Additional information regarding attempted service, etc:

---

PI-2136650 v1

## VENUE ENFORCEMENT REPORT

Date of Event: _3-28-15_

Event Venue: _SAP CENTER_

Name of Defendant Served: _Dominic Angel Rodriguez_

Address of Defendant Served:

_3015 E. Bayshore Rd, Spc 202_

_Redwood City, CA 94063_

Time Defendant Served: _3:20 pm_

Type of Merchandise Seized: _"Fat Heads"_

Quantity of Merchandise Seized: _2_

Approx. Height of Defendant: _5'7"_

Approx. Weight of Defendant: _175 lbs_

Ethnicity of Defendant: _W_

Law enforcement involvement: _HBI Seizure_

P3-2136650 v1

---

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01263-VC

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* **Dominic Angel Rodriguez**
was received by me on *(date)* _3/28/15_ .

☒ I personally served the summons on the individual at *(place)* **SAP Center on Autumn St.**
_____ on *(date)* _3/28/15_ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _3/28/15_                       _____
                                         *Server's signature*

                                      Todd Schoenberger
                                      _____
                                         *Printed name and title*

                                      200 S. First St., Ste 120
                                      San Jose, CA 95113
                                      _____
                                         *Server's address*

Additional information regarding attempted service, etc:

**One of the bootleggers we served during the WWE Hall of Fame (selling counterfeit WWE cardboard signs) later thanked us through Instagram for the way in which WWE and DHS conducted the seizure and for the explanations we provided…**







**notfamous61** 4d
NOT FAMOUS ® HUSTLE HEAD···Normal

♥ 69  💬 5

♥ @takervip  @voodoodopeboyfresh61
@j_bert8  @starcitygraphics

 **notfamous61 You Just Got Served !**
**Everything went great at the WWE Hall of Fame ! We had a**
**minor issue with Law Enforcement. But thankfully they all**
**Loved HustleHeads !!! SEE YOU GUYS TOMORROW AT**
**#WRESTLEMANIA !!!** 4d

**big_pat_925** Did u take Macho mans out to the shark tank?
@notfamous61 4d

**notfamous61** Yes @big_pat_925 they made me leave and
confiscated a few 4d

**big_pat_925** Aww damn!! Were u at least able to off some
before Johnny law gave u the boot? @notfamous61 4d

**notfamous61** Kinda @big_pat_925 4d

 **big_pat_925** Oh ok. I'll see u tomorrow at mania bro!
@notfamous61 4d

» LOG IN to write comment.

**On Sunday, March 29th, while fans were tailgating in the parking lot of Levi Stadium, waiting for WrestleMania 31 to begin, DHS discovered bootleggers selling counterfeit WWE cloth pennants to fans in the parking lots:**

**DHS seized this counterfeit product and served the defendant…**






**VENUE ENFORCEMENT REPORT**

Date of Event: __3/21/2015__

Event Venue: __Levi's Stadium__

Name of Defendant Served: __Ibraham Nimer Shiheiber__

Address of Defendant Served:

__847 Skyline__

__Daly City, CA 94133__

Time Defendant Served: __18:40__

Type of Merchandise Seized: __Flags / Towels__

Quantity of Merchandise Seized: __62__

Approx. Height of Defendant: __5'7"__

Approx. Weight of Defendant: __160 lbs.__

Ethnicity of Defendant: __W__

Law enforcement involvement: __HSI    Suzuki__

A

P5-2136650 v1

---

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 15-cv-01283-**VC**

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* __Ibrahim Nimer Shiheiber__

was received by me on *(date)* __3/25/2015__ .

☒ I personally served the summons on the individual at *(place)* __Levi's Stadium,__
__Green Lot 1 (4949 Marie De Bartolo Way) Santa Clara, CA 95050__ on *(date)* __3/29/2015__ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ __0.00__ .

I declare under penalty of perjury that this information is true.

Date: __3/29/15__

_____
*Server's signature*

Todd Schoenberger
_____
*Printed name and title*

380 S. First St.
Suite 110
San Jose, CA 95113
_____
*Server's address*

Additional information regarding attempted service, etc:

**Police presence was strong throughout the WrestleMania week of events, driving counterfeiters away:**



**Security inside the stadium was abundant:**















# Nevertheless, we know we'll be "hit" throughout the year when the police presence is not so prevalent...

**JANUARY 25, 2015 – PHILADELPHIA, PENNSYLVANIA:**
(about twelve different men selling bootleg at this event)



(front)



(back)

*** *This is the same "Live Raw/SmackDown 2015 Design"
that is sold repeatedly in different cities.*

## FEBRUARY 3, 2015 – COLORADO SPRINGS, COLORADO:

Our venue merchandise coordinator reported to WWE Legal: "Bootlegged heavy tonight in Co Springs. I chased them off of the front steps as there were 8 guys lined up right in front of the main entrance. They just went down to the street and parking lot and continued to sell. I didn't confiscate any shirts but it was the same weak tour shirt that we have seen the last couple of weeks. Each guy had a bag full of shirts instead of the normal act of just keeping a couple on them at a time."





**MARCH 7, 2015: - NEWARK, NEW JERSEY:**

 

*** *This is the same "Live Raw/SmackDown 2015 Design"*
*that is sold repeatedly in different cities.*

## MARCH 10, 2015 – DETROIT, MICHIGAN:
**(local police sent these photos to WWE)**

- *__Two different men__ were selling the identical shirt on this night.*

- *This is the same "Live Raw/SmackDown 2015 Design" that is sold repeatedly in different cities.*



Earnest Riley  bm 41954.2238
crane Detroit mi



## Counterfeit Product Sold at WWE Live Events:

- **Traditionally sized for children to wear**

- **Inferior shirt quality – could be flammable**

- **Inferior ink quality – could be flammable, cause allergic reactions**

- **Counterfeiters keep them "stored" in their pants until sale is made**

- **Often have strong, adverse odors not noticed until indoors**

## POSE A SIGNIFICANT PUBLIC SAFETY RISK!